Sigval **BERGESEN**, as Owners of the M/T **SYDFONN, FROSTFONN** and **NORDFONN**, Petitioner-Appellee,

v.

**JOSEPH MULLER CORPORATION,** Respondent-Appellant.

No. 951, Docket 82–7880.

United States Court of Appeals, Second Circuit.

Argued Feb. 28, 1983.

Decided June 17, 1983.

Michael R. Sonberg, New York City (Michael T. Sullivan, Moore, Berson, Lifflander & Mewhinney, New York City, of counsel), for respondent-appellant.

Elisa M. Pugliese, Raymond A. Connell, Healy & Baillie, New York City, for petitioner-appellee.

Before FEINBERG, Chief Judge, and CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

The question before us on this appeal is whether the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38, is applicable to an award arising from an arbitration held in New York between two foreign entities. Responding to the rapid expansion of international trade following World War II, the Convention reflects the efforts of businessmen involved in such trade to provide a workable mechanism for the swift resolution of their day-to-day disputes. International merchants often prefer arbitration over litigation because it is faster, less expensive and more flexible. But previous international agreements had not proved effective in securing enforcement of arbitral awards; nor had private arbitration through the American Arbitration Association, the International Chamber of Commerce, the London Court of Arbitration and the like been completely satisfactory because of problems in enforcing awards. *See generally* Pisar, *The United Nations Convention on Foreign Arbitral Awards,* 33 S.Cal.L.Rev. 14 (1959) (Pisar); Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 70 Yale L.J. 1049, 1051 (1961) (Quigley).

In 1958, a convention was called to deal with these problems. The United States attended and participated in the conference but did not sign the Convention. Ten years later, in 1968, the Senate gave its consent, but accession was delayed until 1970 in order for Congress to enact the necessary implementing legislation. *See* McMahon, *Implementation of the United Nations Convention on Foreign Arbitral Awards in the United States,* 2 J.Mar.L.Com. 735, 737 (1971) (McMahon). There was no opposition to the proposed legislation, H.R.Rep. No. 91–1181, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S.Code Cong. & Ad.News 3601, 3602, which became 9 U.S.C. §§ 201–208 (1976).

In resolving the question presented on this appeal, we are faced with the difficult task of construing the Convention. The family of nations has endlessly—some say since the Tower of Babel—sought to breach the barrier of language. As illustrated by the proceedings at this conference, the delegates had to comprehend concepts familiar in one state that had no counterpart in others and to compromise entrenched and differing national commercial interests. Concededly, 45 nations cannot be expected to produce a document with the clear precision of a mathematical formula. Faced with the formidable obstacles to agreement, the wonder is that there is a Convention at all, much less one that is serviceable and enforceable. Yet, the proposals agreed upon in the Convention have not raised the kinds of legal questions that a commentator reported one of the delegates feared would be the joy of jurists, but the bane of plaintiffs, *see* Contini, *International Commercial Arbitration,* 8 Am.J.Comp.L. 283, 293 (1959) (Contini).

I

The facts are undisputed and may be briefly stated. Sigval Bergesen, a Norwegian shipowner, and Joseph Muller Corporation, a Swiss company, entered into three charter parties in 1969, 1970 and 1971. The 1969 and 1970 charters provided for the transportation of chemicals from the United States to Europe. The 1971 charter concerned the transportation of propylene from the Netherlands to Puerto Rico. Each charter party contained an arbitration clause providing for arbitration in New York, and the Chairman of the American Arbitration Association was given authority to resolve disputes in connection with the appointment of arbitrators.

In 1972, after disputes had arisen during the course of performing the 1970 and 1971 charters, Bergesen made a demand for arbi-

tration of its claims for demurrage and shifting and port expenses. Muller denied liability and asserted counterclaims. The initial panel of arbitrators chosen by the parties was dissolved because of Muller's objections and a second panel was selected through the offices of the American Arbitration Association. This panel held hearings in 1976 and 1977 and rendered a written decision on December 14, 1978. It decided in favor of Bergesen, rejecting all of Muller's counterclaims save one. The net award to Bergesen was $61,406.09 with interest.

Bergesen then sought enforcement of its award in Switzerland where Muller was based. For over two years Muller successfully resisted enforcement. On December 10, 1981, shortly before the expiration of the three-year limitations period provided in 9 U.S.C. § 207, Bergesen filed a petition in the United States District Court for the Southern District of New York to confirm the arbitration award. In a decision dated October 7, 1982 and reported at 548 F.Supp. 650 (S.D.N.Y.1982), District Judge Charles S. Haight, Jr. confirmed Bergesen's award, holding that the Convention applied to arbitration awards rendered in the United States involving foreign interests. Judgment was entered awarding Bergesen $61,-406.09, plus interest of $18,762.01. Additionally, Bergesen received $8,462.00 for Muller's share of arbitrators' fees and expenses which it had previously paid, together with interest of $2,253.63 on that amount.

On appeal from this $90,883.73 judgment, Muller contends that the Convention does not cover enforcement of the arbitration award made in the United States because it was neither territorially a "foreign" award nor an award "not considered as domestic" within the meaning of the Convention. Muller also claims that the reservations adopted by the United States in its accession to the Convention narrowed the scope of its application so as to exclude enforcement of this award in United States courts,

that the statute implementing the treaty was not intended to cover awards rendered within the United States, and finally, that Bergesen's petition to obtain enforcement was technically insufficient under the applicable requirements of the Convention.

## II

Whether the Convention applies to a commercial arbitration award rendered in the United States is a question previously posed but left unresolved in this Court. See Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G., 579 F.2d 691, 699 n. 11 (2d Cir.1978); I/S Stavborg v. National Metal Converters, Inc., 500 F.2d 424, 426 n. 2 (2d Cir.1974). The two district courts that have addressed the issue have reached opposite conclusions, with little in the way of analysis. Compare Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co., A.G., 480 F.Supp. 352, 353 (S.D.N.Y.) (Haight, J.) (finding the Convention applicable), aff'd mem., 614 F.2d 1291 (2d Cir.1979), cert. denied, 445 U.S. 930, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980) with Diapulse Corporation of America v. Carba, Ltd., No. 78 Civ. 3263 (S.D.N.Y. June 28, 1979) (Broderick, J.) (Convention did not apply "by its terms"), remanded on other grounds, 626 F.2d 1108 (2d Cir.1980). The facts of the instant case make it necessary to resolve what this Court earlier termed an "intriguing" issue, see Andros Compania Maritima, S.A., 579 F.2d at 699 n. 11.

To resolve that issue we turn first to the Convention's history. Under the auspices of the United Nations, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards was convened in New York City in 1958 to resolve difficulties created by two earlier treaties—the 1923 Geneva Protocol on Arbitration Clauses, 27 L.N.T.S. 157 (1924), and the 1927 Geneva Convention on the Execution of Foreign Arbitral Awards, 92 L.N.T.S. 301 (1929). Because of the legal and practical difficulties which arose from application of these earlier treaties,[1] one commentator wrote,

1. For a discussion of the exact nature of the problems see Contini, *International Commer-*

*cial Arbitration,* 8 Am.J.Comp.L. 283, 288–90 (1959); Quigley, *Accession by the United*

"The formidable amount of highly qualified labor which went into their preparation has not been rewarded by any perceptible progress in international commercial arbitration." Nussbaum, *Treaties on Commercial Arbitration—A Test of International Private-Law Legislation,* 56 Harv.L.Rev. 219, 236 (1942).

A proposed draft of the 1958 Convention which was to govern the enforcement of foreign arbitral awards stated that it was to apply to arbitration awards rendered in a country other than the state where enforcement was sought. *See* G. Haight, *Convention on the Recognition and Enforcement of Foreign Arbitral Awards* 1 (1958) (Haight). This proposal was controversial because the delegates were divided on whether it defined adequately what constituted a foreign award. On one side were ranged the countries of western Europe accustomed to civil law concepts; on the other side were the eastern European states and the common law nations. Contini at 292. For example, several countries, including France, Italy and West Germany, objected to the proposal on the ground that a territorial criterion was not adequate to establish whether an award was foreign or domestic. These nations believed that the nationality of the parties, the subject of the dispute and the rules of arbitral procedure were factors to be taken into account in determining whether an award was foreign. *Id.;* Haight at 2. In both France and West Germany, for example, the nationality of an award was determined by the law governing the procedure. Thus, an award rendered in London under German law was considered domestic when enforcement was attempted in Germany, and an award rendered in Paris under foreign law was considered foreign when enforcement was sought in France. Contini at 292. As an alternative to the territorial concept, eight European nations proposed that the Convention "apply to the recognition and enforcement of arbitral awards other than those considered as domestic in the country

in which they are relied upon." Haight at 2. Eight other countries, including the United States, objected to this proposal, arguing that common law nations would not understand the distinction between foreign and domestic awards. These latter countries urged the delegates to adopt only the territorial criterion.

A working party composed of representatives from ten states to which the matter was referred recommended that both criteria be included. Thus, the Convention was to apply to awards made in a country other than the state where enforcement was sought as well as to awards not considered domestic in that state. The members of the Working Party representing the western European group agreed to this recommendation, provided that each nation would be allowed to exclude certain categories of awards rendered abroad. At the conclusion of the conference this exclusion was omitted, so that the text originally proposed by the Working Party was adopted as Article I of the Convention. A commentator noted that the Working Party's intent was to find a compromise formula which would restrict the territorial concept. Contini at 293. The final action taken by the Convention appears to have had the opposite result, i.e., except as provided in paragraph 3, the first paragraph of Article I means that the Convention applies to all arbitral awards rendered in a country other than the state of enforcement, whether or not such awards may be regarded as domestic in that state; *"it also applies to all awards not considered as domestic in the state of enforcement, whether or not any of such awards may have been rendered in the territory of that state." Id.* at 293–94 (emphasis supplied).

To assure accession to the Convention by a substantial number of nations, two reservations were included. They are set forth in Article I(3). The first provides that any nation "may on the basis of reciprocity declare that it will apply the Convention" only to those awards made in the territory of

*States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbi-*

*tral Awards,* 70 Yale L.J. 1049, 1055 (1961).

another contracting state. The second states that the Convention will apply only to differences arising out of legal relationships "considered as commercial under the national law" of the state declaring such a reservation. These reservations were included as a necessary recognition of the variety and diversity of the interests represented at the conference, as demonstrated, for example, by the statement of the delegate from Belgium that without any right of reservation his country would not accede. Haight at 16; Quigly at 1061.

### III

With this background in mind, we turn to Muller's contentions regarding the scope of the Convention. The relevant portion of the Convention, Article I, is set forth in the margin.[2] The territorial concept expressed in the first sentence of Article I(1) presents little difficulty. Muller correctly urges that since the arbitral award in this case was made in New York and enforcement was sought in the United States, the award does not meet the territorial criterion. Simply put, it is not a foreign award as defined in Article I(1) because it was not rendered outside the nation where enforcement is sought.

Muller next contends that the award may not be considered a foreign award within the purview of the second sentence of Article I(1) because it fails to qualify as an award "not considered as domestic." Muller claims that the purpose of the "not considered as domestic" test was to provide for the enforcement of what it terms "stateless awards," i.e., those rendered in the territory where enforcement is sought but considered unenforceable because of some foreign component. This argument is unpersuasive since some countries favoring the provision desired it so as to preclude the enforcement of certain awards rendered abroad, not to enhance enforcement of awards rendered domestically.

Additionally, Muller urges a narrow reading of the Convention contrary to its intended purpose. The Convention did not define nondomestic awards. The definition appears to have been left out deliberately in order to cover as wide a variety of eligible awards as possible, while permitting the enforcing authority to supply its own definition of "nondomestic" in conformity with its own national law. Omitting the definition made it easier for those states championing the territorial concept to ratify the Convention while at the same time making the Convention more palatable in those states which espoused the view that the nationality of the award was to be determined by the law governing the arbitral procedure. We adopt the view that awards "not considered as domestic" denotes awards which are subject to the Convention not because made abroad, but because made within the legal framework of another country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction. *See generally* Pisar at 18. We prefer this broader construction because it is more in line with the intended purpose of the treaty, which was entered into to encourage the recognition and enforcement of international arbitration awards, *see Scherk v. Alberto Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974). Applying that purpose to this case involving two foreign entities leads to the conclusion that this award is not domestic.

### IV

Muller also urges us to interpret the Convention narrowly based on the fact that, as stated in a Presidential Proclamation dated September 1, 1970, 21 U.S.T. 2517, T.I.A.S. No. 6997, the 1970 accession by the United States to the Convention adopted both reservations of Article I(3). The fact

---

2. This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

that the United States acceded to the Convention with a declaration of reservations provides little reason for us to construe the accession in narrow terms. Had the United States acceded to the Convention without these two reservations, the scope of the Convention doubtless would have had wider impact. Comment, *International Commercial Arbitration Under the United Nations Convention and the Amended Federal Arbitration Statute,* 47 Wash.L.Rev. 441 (1972). Nonetheless, the treaty language should be interpreted broadly to effectuate its recognition and enforcement purposes. *See Scherk,* 417 U.S. at 520 n. 15, 94 S.Ct. at 2457 n. 15 (the Convention's goal was "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts"); *Reed v. Wiser,* 555 F.2d 1079, 1088 (2d Cir.), *cert. denied,* 434 U.S. 922 (1977); *cf. Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (Rakta),* 508 F.2d 969, 974 (2d Cir.1974) (defenses to enforcement of foreign awards under the Convention are narrowly construed).

## V

We now turn to the argument that the implementing statute was not intended to cover awards rendered within the United States. Section 202 of Title 9 of the United States Code which is entitled "Agreement or award falling under the Convention," provides in relevant part:

> An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

The legislative history of this provision indicates that it was intended to ensure that "an agreement or award arising out of a legal relationship exclusively between citizens of the United States is not enforceable under the Convention in [United States] courts unless it has a reasonable relation with a foreign state." H.R.Rep. No. 91–1181, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S.Code Cong. & Ad.News 3601, 3602. Inasmuch as it was apparently left to each state to define which awards were to be considered nondomestic, *see Pisar* at 18, Congress spelled out its definition of that concept in section 202. Had Congress desired to exclude arbitral awards involving two foreign parties rendered within the United States from enforcement by our courts it could readily have done so. It did not. *See Sumitomo Corp. v. Parakopi Compania Maritima,* 477 F.Supp. 737, 741 (S.D.N.Y.1979), *aff'd mem.,* 620 F.2d 286 (2d Cir.1980); Aksen, *American Arbitration Accession Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 3 Sw.U.L.Rev. 1, 16 (1971) (Under implementing legislation Convention should apply when foreign contacts are substantial, i.e., "where a foreign person or corporation is a party to an agreement involving foreign performance, or where the business deal has some other 'reasonable relation with one or more foreign states.'"); *see also* McMahon at 740–43 (questioning whether section 202 covers awards similar to that in the present case).

Additional support for the view that awards rendered in the United States may qualify for enforcement under the Convention is found in the remaining sections of the implementing statute. It has been held that section 203 of the statute provides jurisdiction for disputes involving two aliens. *See Sumitomo Corp.,* 477 F.Supp. at 740–41. Section 204 supplies venue for such an action and section 206 states that "[a] court having jurisdiction under this chapter may direct that arbitration be held ... at any place therein provided for, *whether that place is within or without the United States*" (emphasis supplied). It would be anomalous to hold that a district court could direct two aliens to arbitration within the United States under the statute, but that it could not enforce the resulting award under legislation which, in large part, was enacted for just that purpose.

Muller's further contention that it could not have been the aim of Congress to apply

**934**

the Convention to this transaction because it would remove too broad a class of awards from enforcement under the Federal Arbitration Act, 9 U.S.C. §§ 1–13, is unpersuasive. That this particular award might also have been enforced under the Federal Arbitration Act is not significant. There is no reason to assume that Congress did not intend to provide overlapping coverage between the Convention and the Federal Arbitration Act. Similarly, Muller's argument that Bergesen only sought enforcement under the terms of the Convention because it has a longer statute of limitations than other laws under which Bergesen could have sued is irrelevant. Since the statutes overlap in this case Bergesen has more than one remedy available and may choose the most advantageous.

## VI

Finally, Muller asserts that Bergesen's petition for enforcement was technically insufficient and did not meet the requirements of the Convention. Bergesen submitted the affidavit of Harry Constas, chairman of the arbitration panel, certifying the award and the charter parties on which it was based. Under Article IV(1) of the Convention

> [t]o obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application supply:
> (a) The duly authenticated original award or a duly certified copy thereof;
> (b) The original agreement referred to in article II or a duly certified copy thereof.

Muller would have us read this provision as requiring either a duly authenticated original or a duly certified copy *of a duly authenticated* original. Such an interpretation is unnecessarily restrictive and at odds with a common sense reading of the provision. Copies of the award and the agreement which have been certified by a member of the arbitration panel provide a sufficient basis upon which to enforce the award and such were supplied in this case.

The judgment is affirmed.