James P. CORCORAN, Superintendent of Insurance of the State of New York, and his successors in office as Superintendents of Insurance of the State of New York, as Liquidator of Nassau Insurance Company, in Liquidation, Plaintiff,

v.

ARDRA INSURANCE COMPANY, LTD., Richard S. Diloreto and Jeanne S. Diloreto, Defendants.

No. 85 Civ. 6304 (PKL).

United States District Court, S.D. New York.

April 16, 1987.

cers of Ardra, Richard S. Diloreto and Jeanne S. Diloreto (the "DiLoretos") seeking the recovery of reinsurance proceeds under three reinsurance agreements (the "Reinsurance Agreements") between Nassau and Ardra. The Superintendent commenced this action in New York State Supreme Court, New York County. Subsequently, Ardra demanded arbitration under each of the Reinsurance Agreements. Pursuant to Ardra's arbitration demands, defendants also moved to dismiss or stay the state action and for relief prior to answer pursuant to N.Y.C.P.L.R. § 3211(a). The Superintendent responded by cross-moving for summary judgment. Instead of replying to the Superintendent's motion in the state court, defendants removed this action to this Court, seeking an order compelling arbitration, dismissing the complaint against Ardra, and dismissing or staying all proceedings with respect to the DiLoretos. In response, the Superintendent seeks remand of this action to the state court. For the reasons set forth below, the Superintendent's motion for remand is granted.

Alberti & Epstein for the Liquidation Bureau of the Ins. Dept. of the State of N.Y., Andrew A. Alberti, LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff; Cecelia Kempler, Ronald J. Gizzi, Barbara W. Vermuelen, of counsel.

Rein, Mound & Cotton, New York City, for defendants; James D. Veach, Adam B. Rowland, of counsel.

## OPINION & ORDER

LEISURE, District Judge:

Plaintiff, James P. Corcoran, Superintendent of Insurance of the State of New York ("the Superintendent"), as Liquidator of Nassau Insurance Company ("Nassau"), has brought this action against the Ardra Insurance Company Ltd. ("Ardra"), a Bermuda reinsurance company, and two offi-

## FACTUAL BACKGROUND

In this action, the Superintendent, as Liquidator of Nassau, seeks recovery of reinsurance [1] proceeds allegedly owed by Ardra to Nassau for payment of claims arising under certain policies issued by Nassau. *See* Complaint at ¶ 1. Specifically, this dispute involves three Reinsurance Agreements entered into by Nassau and Ardra. The Reinsurance Agreements covered (a) commercial automobile liability, general liability, lawyers professional package liability, excess commercial automobile liability and excess general liability policies written by Nassau, (b) personal injury protection benefits written under New York Automobile Statutory No-Fault coverage, and (c) excess automobile bodily injury medallion taxicab policies. *See* Affidavit of Ronald J. Gizzi, Esq., sworn to on August 29, 1985

---

1. "Reinsurance is the 'ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the ... ceding company ... [which] retains all contact with the original insured, and handles all matters prior to and subsequent to loss.'" *Skandia America Reinsurance Corp. v. Schenck,* 441 F.Supp. 715, 724 (S.D.N.Y.1977) (quoting 13A J. Appelman & J. Appleman, *Insurance Law & Practice* § 7681, ch. 278, at 480 (rev. ed. 1976)).

("Gizzi Aff."), Exhibits B, C and D, annexed thereto. Ardra assumed a substantial portion of risks on those policies written by Nassau which were covered pursuant to the Reinsurance Agreements. In consideration for Ardra reinsuring such a substantial portion of Nassau's liabilities, Nassau paid $10,682,924.84 in premiums to Ardra.

Nassau was placed in liquidation on June 22, 1984, after having been in rehabilitation for three months. The Order of Liquidation (the "Order") was issued pursuant to Article 74 of the New York Insurance Code, N.Y. Ins. Law § 7401 *et seq.* (McKinney 1985), which governs the manner of rehabilitation and liquidation of insolvent insurers domiciled in New York, Nassau's state of domicile. The Order authorizes the Superintendent, in his capacity as Liquidator of Nassau, to take various actions, including taking possession of the property of Nassau, liquidating the business of Nassau, paying claims arising under policies issued by Nassau, collecting reinsurance on such claims, and collecting other debts owed to Nassau. The Order also terminates all outstanding policy and other insurance obligations of Nassau, as well as other subsisting contracts, tax sharing agreements and other obligations of Nassau. Finally, the Order prohibits all persons, "including but not limited to claimants", from:

> [B]ringing ... any action at law, suit in equity, *special or other proceeding* against [Nassau] or its estate, or the Superintendent ... or from in any way interfering with the Superintendent ..., in his or their possession, control or management of the property of said corporation, or in the discharge of his or their duties as Liquidator thereof, or in the liquidation of the business of said corporation....

Order of Liquidation at 8 (emphasis added).

On February 19, 1985, Ardra's Board of Directors authorized the sending of a disclaimer letter to the Superintendent. The letter stated that Ardra was repudiating the Reinsurance Agreements because the Superintendent failed to cooperate with Ardra by allowing Ardra's representatives to participate directly in court proceedings involving third party claims against Nassau's insureds as allegedly required under the Reinsurance Agreements. Subsequently the Superintendent commenced this action.

## LEGAL DISCUSSION

Defendants argue that this dispute is "basically a contract action brought by plaintiff as liquidator of Nassau ... against [Ardra], a Bermuda reinsurance company." D. Memo. at 1. Defendants allege that because the dispute between Ardra and the Superintendent purportedly "falls clearly within mandatory arbitration clauses in each of the reinsurance agreements ..." the instant matter should be referred to arbitration. *Id.* More specifically, according to defendants, the Court has the power and obligation to refer this dispute to arbitration under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N. T.S. 38 (Dec. 29, 1970), *implemented* by 9 U.S.C. § 201 *et seq.* (the "Convention"). The Superintendent, however, contends that this action should be remanded to the State Supreme Court on the grounds that (1) the State Supreme Court has exclusive jurisdiction over all matters relating to the liquidation of Nassau pursuant to Article 74 of the New York Insurance Code and in accordance with the delegation of powers to the states by the McCarran-Ferguson Act ("McCarran-Ferguson"), 15 U.S.C. § 1011 *et seq.;* (2) the Convention does not apply to the instant dispute; and (3) abstention is appropriate to allow the State Supreme Court to decide issues of first impression raised by the Superintendent. P. Memo. at 1–2.

This Court has confronted previously the issue of whether the McCarran-Ferguson Act precludes the application of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (1976) (the "Arbitration Act") to Article 74. *See Washburn v. Corcoran,* 643 F.Supp. 554 (S.D.N.Y.1986) (Leval, J.); *Bernstein v. Centaur Ins. Co.,* 606 F.Supp. 98 (S.D.N.Y. 1984). However, the question now possibly before the Court, regarding the relation-

ship between the Convention and McCarran-Ferguson, is one of first impression.[2] Although this question is undoubtedly significant and interesting, before reaching it the Court must be satisfied first that the Convention applies to this dispute.

## A. THE CONVENTION

As the Second Circuit explained in *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928 (2d Cir.1983), "[i]nternational merchants often prefer arbitration over litigation because it is faster, less expensive and more flexible." *Id.* at 929. In 1958, the Convention was called in an attempt to improve upon previous international agreements and private mechanisms designed to facilitate international arbitration. *Id. See,* Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 70 Yale L.J. 1049, 1051 (1961); McMahon, *Implementation of the United Nations Convention on Foreign Arbitral Awards in the United States,* 2 J.Mar.L.Com. 735, 737 (1971). Although the United States attended and participated in the conference, it did not sign the Convention. "Ten years later, [however,] in 1968, the Senate gave its consent, but accession was delayed until 1970 in order for Congress to enact the necessary implementing legislation." *Bergesen, supra,* 710 F.2d at 929 (citation omitted). As the Supreme Court stated:

> The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.

*Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974) (citations omitted).

In furtherance of this policy, the Convention provides for the recognition of both arbitral agreements and arbitral awards. Article II of the Convention states:

> 1. Each [signatory country] shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
>
> . . . . .
>
> 3. The court of a [signatory country], when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

*See* 9 U.S.C.A. § 201 note (1985) (Supp.) (reprinting Convention).

"A court presented with a request to refer a dispute to arbitration pursuant to [the Convention] performs a very limited inquiry." *Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186 (1st Cir.1982). The Court in *Ledee* reduced the inquiry to four questions:

> (1) Is there an agreement in writing to arbitrate the subject of the dispute? [Citations omitted.]
>
> (2) Does the agreement provide for arbitration in the territory of a signatory of the Convention? [Citations omitted.]
>
> (3) Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial? [Citations omitted.]
>
> (4) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relationship with one or more foreign states? [Citations omitted.]

*Id.* at 186–87. Therefore, before applying the Convention, the Court must find that all four of these elements are present.

---

**2.** Defendants eschew reliance on the Arbitration Act. *See* Defendants' Memorandum of Law in Further Support ("D. Memo. Further Support") at 12–13.

In the instant action, the Superintendent concedes the presence of elements (1), (2) and (4). The written Reinsurance Agreements contain arbitration clauses [3]; the clauses provide for arbitration in the United States and Bermuda, both signatories to the Convention; and defendant is a citizen of Bermuda.[4] Plaintiff, however, contests whether the third element of the inquiry is present here, as well as the interpretation of the meaning of that element.

## 1. Commercial Relationships and Disputes

The Convention governs commercial relationships and disputes arising out of those relationships. Therefore, the Superintendent cannot, nor does he, deny that arbitration is appropriate "when two insurers are engaged in a commercial dispute unrelated to any insurance regulatory function." Plaintiff Reply Memorandum ("P. Reply") at 13; *see Ideal Mutual Ins. Co. v. Phoenix Greek Ins.*, No. 83–4687 (S.D.N.Y. July 3, 1984) (Haight, J.) [Available on WESTLAW, DCT database]; *Hamilton Life Ins. Co. of New York v. Republic National Life Ins. Co.*, 408 F.2d 606 (2d Cir.1969); *Ohio Reinsurance Corp. v. British Nat. Ins. Co.*, 587 F.Supp. 710 (S.D.N.Y.1984). The Superintendent also concedes, as he must, that arbitration is appropriate "where a government entity voluntarily enter[s] into a commercial relationship with a private party...." P. Reply at 13 (citing *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F.Supp. 1 (S.D.N.Y.), *aff'd on other grounds*, 489 F.2d 1313 (2d Cir.1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974)). The Superintendent, however, submits that the instant action does not fall under either of the aforementioned categories.

The Superintendent points out that Nassau does not have a commercial relationship with Ardra because, as of June 22, 1984, Nassau had no commercial corporate existence, independent of New York's regulatory scheme for liquidating insolvent insurance companies. *See* N.Y.Ins.Law § 7401 *et seq.* (McKinney 1985). The Order dissolved Nassau; it states that Nassau's corporate charter is "annulled and forfeited." Order of Liquidation at 3; *see also* N.Y.Ins.Law § 7405 (McKinney 1985). Therefore, the Superintendent is correct that this is not merely a dispute between two private insurers, independent of any regulatory function of the Superintendent. The Superintendent also correctly notes that he was not a party to the Reinsurance Agreements, nor did he bargain to arbitrate with Ardra. Thus, this is also *not* a case where a government entity entered voluntarily into a commercial relationship with a private party.

In addition to demonstrating that the instant dispute does not fall clearly into a category routinely deemed "commercial" pursuant to the Convention, the Superintendent suggests that "by its own terms, the Convention is not applicable in this case." P. Reply at 19. According to the Superintendent, the "Convention only applies to '*differences* arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States.'" *Id.* (quoting the Convention, n. 43) (emphasis added). Thus, the Superintendent argues, "[d]efendants misconstrue the Convention's application by contending that it applies to 'any written agreement *arising out of* a legal relationship which is considered as commercial." P. Reply at 19 (quoting D. Memo. Further Support at 16) (emphasis in defendants' memorandum).

---

**3.** In the arbitration clauses the scope of the duty to arbitrate is defined as follows:

> If any dispute shall arise between the Reinsured and Reinsurer, ... with reference to the interpretation of this contract or the rights of either party with respect to any transactions under the contract, the dispute shall be referred to [arbitration]....

Gizzi Aff. exhibits B, C, and D, attached thereto.

**4.** Under the Convention, a corporation is a United States citizen only if "it is incorporated or has its principal place of business in the United States." 9 U.S.C. § 202. Plaintiff does not dispute that Ardra is incorporated and has its principal place of business in Bermuda. *See* Complaint, ¶ 3 ("defendant Ardra is a corporation organized under the laws of and domiciled in Bermuda.")

This distinction is critical because although the Superintendent concedes that the Reinsurance Agreements initially arose out of the commercial relationship between Ardra and Nassau, "the *differences* in this action arose out of the relationship between the Superintendent and Ardra." P. Reply at 19 (emphasis in original).

This distinction drawn by the Superintendent is significant if Ardra's relationship with the Superintendent, as the Liquidator of Nassau, is qualitatively different (i.e. regulatory versus commercial) from Ardra's former relationship with Nassau. "The Superintendent contends that he does not stand precisely in Nassau's 'commercial' shoes; that subject to ultimate guidance of the State Supreme Court, [pursuant to Article 74,] the Superintendent's powers as liquidator give him rights which Nassau may not have enjoyed with respect to the reinsurance agreements." P. Reply at 20. Although defendants ostensibly disagree with the Superintendent, the language of their argument, in effect, supports the Superintendent's position. Defendants state that *"[t]o the extent that [the Superintendent] pursues a right of action on behalf of Nassau ...* the liquidator is dealing with a dispute which arises out of a commercial relationship." D. Memo. Further Support at 19. It is, however, this precise issue—to what extent the Superintendent is acting merely as a representative of Nassau—which the Superintendent argues is the threshold question before the Court.

In addition to suggesting this question as the threshold inquiry of the instant dispute, the Superintendent argues that the question should be answered, in the first instance, by the New York State Supreme Court. The Superintendent points out that the New York court is more familiar with New York law and therefore is better suited for determining issues of New York law. Moreover, the Court notes that the state courts have a strong interest in furthering the uniform interpretation of the state's law. Furthermore, a finding by the State Supreme Court that the legal relationship between the Superintendent and Ardra is identical to that which existed

between Nassau and Ardra, would moot, in this case, defendant's suggested distinction between commercial differences and commercial agreements. Finally, the Superintendent concedes that if the State Supreme Court "agrees with Ardra's view that the Superintendent stands precisely in Nassau's shoes, the Convention will apply and [he] will submit to arbitration." P. Reply at 30. For the above reasons, the Superintendent argues that this Court should abstain from deciding the instant dispute and instead, remand the case to the New York State Supreme Court.

## B. ABSTENTION

"As a general rule, the federal courts are under a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Canady v. Koch*, 608 F.Supp. 1460, 1466 (S.D.N.Y), aff'd, 768 F.2d 501 (2d Cir.1985) (quoting *Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)). The Superintendent argues that the instant action "is one of those exceptional cases where the district court should decline to decide a dispute properly before it." *Canady, supra*, 608 F.Supp. at 1466. The Superintendent contends that the result he desires is justified under the abstention doctrines of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Colorado River, supra*, 424 U.S. at 800, 96 S.Ct. at 1236. The Court will discuss each doctrine separately.

### 1. *Burford Abstention*

"*Burford* abstention is a consequence of the federalist policy of comity between state and federal sovereignties." *Canady, supra*, 608 F.Supp. at 1468. In short, *Burford* abstention allows federal courts "to exercise their discretion to refrain from interfering with state policymaking and enforcement efforts in complex areas which are primarily of state concern and perogative." *Id.*

[This type of a]bstention is ... appropriate where there have been presented dif-

ficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 [79 S.Ct. 1070, 3 L.Ed.2d 1058] (1959).... *See also Kaiser Steel Corp. v. W.S. Ranch Co.*, 391 U.S. 593 [88 S.Ct. 1753, 20 L.Ed.2d 835] (1968); *Hawks v. Hamill*, 288 U.S. 52 [53 S.Ct. 240, 77 L.Ed. 610] (1933). In some cases, however, the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Colorado River, supra*, 424 U.S. at 814, 96 S.Ct. at 1244.

■ The above-quoted language indicates that one factor considered by the federal courts in exercising *Burford* abstention is the complexity and uncertainty of state law relevant to the dispute. When the state law issues presented by the action are clear, it is often inappropriate for the federal courts to abstain. *See, e.g., Bd. of Educ. of Valley View v. Bosworth*, 713 F.2d 1316, 1320 (7th Cir.1983); *Naylor v. Case and McGrath, Inc.*, 585 F.2d 557, 565 (2d Cir.1978) (abstention is inappropriate where state law is clear because the risk of disrupting state law is negligible). However, "unclear state law ... is a compelling factor in favor of abstention...." *Canady, supra*, 608 F.Supp. at 1468 (citations omitted). Nevertheless, unsettled state law is insufficient, in and of itself, to mandate abstention.

■ In addition to evaluations of the complexity and uncertainty of the relevant state law, the federal courts should also assess the effect their decisions could have on state programs. "If the federal court's ruling could have 'broad impact on state policy,' *Smith v. Metropolitan Prop. & Liab. Ins. Co.*, 629 F.2d 757, 760 (2d Cir. 1980), then abstention may be proper." *Canady, supra*, 608 F.Supp. at 1468. More specifically, "where a ruling would

have wide-ranging effect on what are essentially state and local affairs, federal judiciary intervention would be 'inimical to harmonious federalism.'" *Id.* at 1469 (citations omitted).

■ A third factor, related to the two mentioned previously, is the significance of the state's interest in the subject matter underlying the litigation. In matters where the state has a particularly strong interest—often matters in which a federal court decision would have broad impact on state policies—cases brought in the federal courts are more likely to detract, than add, to state attempts to deal rationally with the problem. *Thibodaux, supra*, 360 U.S. at 29, 79 S.Ct. at 1073 ("special nature of eminent domain justifies ... [abstention]").

■ The final consideration relevant to the application of the *Burford* doctrine of abstention is the way in which the state is handling the subject matter underlying the litigation. "Existence of a comprehensive system of state administrative decision-making with specified channels of judicial review is important to a federal court in deciding to abstain.... A specialized review apparatus assures adequate protection of the parties' rights and attention to the matter by an expert tribunal." *Canady, supra*, 608 F.Supp. at 1469 (citing *Burford, supra*, 319 U.S. at 333, 63 S.Ct. at 1107). In short, the existence of a state regulatory scheme supports the exercise by the federal court of *Burford* abstention.

The aforementioned factors highlight the *Burford* doctrine's focus on promoting federal-state relations. These considerations emphasize the nation's interest in allowing states and localities to develop and enforce their own policies, especially in areas traditionally relegated to the province of the states.

■ With respect to the first factor, the Court notes that the construction of the language of the Convention is initially a question of federal law. However, this does not bar *Burford* abstention. As the Second Circuit noted:

In *Burford* itself, violations of federal law were alleged. The claims there

amounted to an attack on the reasonableness of the state administrative action. Thus federal review, while involving decisions of a federal question, would have entailed a *reconsideration of the state administrative decision,* carrying with it the potential for creating inequities in the *administration of the state scheme.* *Burford* thus suggests that proper respect for the expertise of state officials and the expeditious and evenhanded administration of state programs counsels restraint on the part of the federal courts.

*Levy v. Lewis,* 635 F.2d 960, 964 (2d Cir. 1980) (emphasis added).

A similar argument may be made in this case. While defendants' request for arbitration involves questions of federal law—whether the arbitration provisions contained in the Reinsurance Agreements are "commercial" and whether, to the extent that the Superintendent pursues rights of Nassau under the Reinsurance Agreements, the dispute between the Superintendent and Ardra is "commercial"—defendants' claim is inextricably intertwined with complex and unsettled issues of state law. For example, to what degree is the Superintendent—saddled with the duty and responsibility of protecting the interests of policyholders, stockholders, and other general creditors—limited by the contractual rights and obligations negotiated by Nassau in the Reinsurance Agreements. These federal questions, in part dependent upon state questions, are best "left in the first instance to the [state court] with review available ... ultimately in the United States Supreme Court." *Levy, supra,* 635 F.2d at 964.[5]

■ The second factor federal courts should consider in determining whether they should abstain under *Burford* is

whether their ruling could have a broad impact on state policy. The Second Circuit has recognized the importance of liquidation proceedings in the New York state insurance industry. "Liquidation proceedings involve the adjustment of thousands of claims against the insurer by policyholders and those who claim under them, as well as claims by present employees, past employees, and general creditors. Moreover, the claims must be satisfied by marshalling the existing assets of the insolvent company and by reinsuring existing policies using a state fund established for this purpose." *Id.* at 963.

Defendants argue that this case will not impact on New York's policy concerning the liquidation of insolvent insurers. Defendants contend first that the instant "contract dispute" is not part of New York's regulatory scheme. Furthermore, defendants claim that "this is not a case in which the court is being asked to interpret regulations that could have ' "extensive repercussions throughout the insurance industry of the state." ' " D. Memo. Further Support at 33 (quoting *Smith, supra,* 629 F.2d at 761) (in turn quoting *Roy v. Centennial Ins. Co.,* 171 Conn. 463, 473, 370 A.2d 1011, 1017 (1976)). Moreover, defendants assert that "this action does not involve the distribution of assets to policyholders or claimants." D. Memo. Further Support at 33. Defendants' insist that this matter is merely a contract dispute and its referral to an arbitrator "will not interfere in the orderly liquidation of Nassau." *Id.* at 34. Finally, defendants assert blithely that "[r]egardless of the arbitration outcome, claimants under Nassau policies will be paid from the New York State guaranty funds." *Id.* (citing N.Y.Ins. Law, §§ 7405 and 7601(e) (McKinney's 1985)).

In essence, defendants are arguing that New York's entire statutory scheme de-

---

**5.** Moreover, with respect to the ultimate question of determining whether the McCarran-Ferguson Act, conjoined with Article 74's bestowal of exclusive jurisdiction on the State Supreme Court over insurance liquidation proceeding, takes precedence over the Convention, in the context of international reinsurance agreements, the state court "stands in as good if not a better position than the federal courts to make

an initial determination of [the scope of that jurisdiction and the depth of the state's interest.]" *Levy, supra,* 635 F.2d at 964. In fact, defendants expressly decline to argue that the New York state courts would reach a different result than this Court regarding whether the Convention requires arbitration of this dispute. D. Memo. Further Support at 37 n. 10.

signed to regulate the liquidation of insolvent insurers has no bearing on the rights of Ardra. Defendants also appear to claim that policyholders or claimants of Nassau have no interest in the resolution of the dispute between the Superintendent and Ardra. These arguments highlight, rather than alleviate the serious public policy issues involved in these liquidation proceedings.

The Superintendent, under the direction of the State Supreme Court, is authorized to administer liquidation proceedings and the New York Property/Casualty Security Fund (the "Fund"). N.Y.Ins. Law §§ 7405 and 7601(e) (McKinney 1985). In order to comply with these statutory provisions, the Superintendent assumed the responsibility for marshalling and disposing of Nassau's assets to pay creditors, including policyholders. Reinsurance proceeds payable pursuant to the Reinsurance Agreements are assets of Nassau's estate. *See Schenck, supra,* 441 F.Supp. at 723–27; *see also Skandia America Reinsurance Corp. v. Barnes,* 458 F.Supp. 13, 16 (D.Colo.1978). In fact, this Court has perceived that "[r]einsurance takes on added significance when the insurer becomes insolvent." *Schenck, supra,* 441 F.Supp. at 724.

■ Reinsurance proceeds are payable to the Superintendent for the benefit of all creditors of Nassau's or any other insolvent insurer's estate. The Fund, which pays only policyholders, may maintain a claim against the insolvent insurer and becomes a general creditor thereof. *Id.* at 726. Policyholders, however, have no direct right of action against reinsurers. The Fund, therefore, is not permitted to recover reinsurance proceeds from the insolvent company's reinsurers. Only the Superintendent, as the insurer's Liquidator, can recover from the reinsurer. The Court also notes that in the instant case the Reinsurance Agreements provide for payments by Ardra to the Liquidator in the event of Nassau's insolvency.[6]

The Fund is supported by statutorily mandated contributions from solvent insurers licensed to do business in New York. Therefore, defendants' argument that the mere existence of the Fund alleviates any concern New York should have regarding the instant dispute is completely unfounded. In fact, it is of great public concern that insurers, presently in sound financial condition, not be further burdened with assuming addition liabilities unless absolutely necessary. In other words, the Fund, like many others, is not self-sustaining; it is crucial, therefore, to creditors of the insolvent insurer, as well as to policyholders, stockholders, and creditors of presently solvent insurers—forced to contribute to the fund—that the deficit of the insolvent insurer be reduced as much as possible.

■ In addition to the particular concerns discussed above, the Second Circuit noted that the possibility of the liquidation process being reviewed by two authorities further supports the exercise of *Burford* abstention in the context of the insurance industry in New York. Relying on the experience of the federal courts in bank-

---

6. Thus, the Reinsurance Agreements appear to contemplate the transformation of the relationship from one of a commercial nature to one of a regulatory nature. The Reinsurance Agreements contain provisions requiring Ardra to pay reinsurance proceeds to the Liquidator of Nassau if Nassau became insolvent. The provisions are modeled upon § 1308 of N.Y.Ins. Law (formerly § 315). The provisions refer expressly to § 315. Thus, it appears that the parties to the Reinsurance Agreements anticipated, under certain circumstances, the application of New York law to their relationship. Furthermore, pursuant to the laws of New York, when parties make a contract, it is reasonable to infer that they were aware of relevant law, and those laws "must be deemed to have permeated the agreement and constituted elements of the obligation." *People v. Globe Mutual Life Insurance Co.,* 91 N.Y. 174, 179 (1883). This axiom of contract construction has been applied to New York's law of reinsurance and insurer insolvency. *Schenck supra,* 441 F.Supp. at 724; *Matter of Knickerbocker,* 4 N.Y.2d 245, 251, 173 N.Y. S.2d 602, 607, 149 N.E.2d 885, 889 (1958). Therefore, Ardra must be deemed to have had knowledge, at the time it entered into the contract with Nassau, regarding the exclusive jurisdiction of the State Supreme Court with respect to the liquidation of Nassau, and the probable implications of this jurisdiction for the enforceability of each Reinsurance Agreement's arbitration provisions.

ruptcy matters, the Circuit Court acknowledged, within the backdrop of insolvent insurance companies, the "importance of consolidating all of the assets of an insolvent company and gathering all those who have claims against those assets *in a single forum.*" *Levy, supra,* 635 F.2d at 964 (emphasis added).

Experience has demonstrated that, in order to secure an economical, efficient, and orderly liquidation and distribution of the assets of an insolvent corporation for the benefit of all creditors and stockholders, it is essential that the title, custody, and control of the assets be entrusted to a single management under the *supervision of one court.* Hence other courts, except when called upon by the court of primary jurisdiction for assistance, are excluded from participation. This should be *particularly true as to proceedings for the liquidation of insolvent insurance companies....* "

*Motlow v. Southern Holding & Securities Corp.,* 95 F.2d 721, 725–26 (8th Cir.), *cert. denied,* 305 U.S. 609, 59 S.Ct. 68, 83 L.Ed. 388 (1938) (emphasis added).

The Second Circuit, in applying the *Burford* principles to disputes involving New York's insurance industry, also found it "highly significant that the state scheme has been adopted pursuant to congressional authorization." *Levy, supra,* 635 F.2d at 963. In particular the *Levy* Court noted that:

In the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, Congress mandated that regulation of the insurance industry be left to the individual states. Thus the administrative and judicial scheme erected by New York to regulate insurance companies, including that part enabling the institution and implementation of liquidation proceedings, operates pursuant to an *express federal policy of noninterference in insurance matters.*

*Id.* (emphasis added). Therefore, the Circuit Court concluded that it is proper that the "[f]ederal courts have ... been slow to interrupt such schemes unless necessary, particulary when federal court action would impinge upon the area in which Congress has recognized the overriding interest of the States." *Id.* at 963–64.

Finally, as discussed previously, federal courts must also consider *"Burford's* concern with noninterruption of state administrative programs...." *Id.* at 963. As the Second Circuit has explained, "the federal courts have abstained in numerous areas where ... state policies were carried out in a statutorily established regulatory program by state officials." *Id.* (citations omitted). "In this case, New York State has a complex administrative and judicial system for regulating and liquidating domestic insurance companies. [Citation omitted] The Superintendent ... is an experienced state official who has been involved both in rehabilitating and liquidating [domestic insurance companies]." *Id.* Moreover, "[l]iquidation in particular is an area in which the Superintendent's expertise is critical." *Id.*

■ The federal courts applying the *Burford* doctrine must also be concerned with how effectively the state's "specialized review apparatus assures adequate protection of the parties' rights ...", *Canady, supra,* 608 F.Supp. at 1469, as well as the apparatus' expertise. Defendants cannot argue that proceedings before the State Supreme Court do not adequately serve to protect their rights. Defendants can raise the arbitration question before the State Supreme Court. In fact, as defendants, themselves, point out, the New York courts are familiar with the law governing the Convention and the importance of international arbitration agreements. D. Memo. Further Support at 37 n. 10. It is also clear that remanding this case does not foreclose final review of the decision by a federal court, but merely affords the state court the opportunity to clarify an uncertain area of state law, while at the same time enabling this Court to avoid deciding a novel question of federal law prematurely.

For the aforementioned reasons, the teaching of *Burford* support application here of the policies behind abstention.

### 2. *Younger Abstention*

■ Plaintiff also argues that the *Younger* abstention doctrine is appropriate here. "*Younger* held that a federal court should not entertain suits challenging state action when the state has already initiated proceedings in the state courts in which the plaintiff is able to raise federal claims." *Levy, supra,* 635 F.2d at 964. Although *Younger* was a criminal matter, the Supreme Court has stated that the reasoning underlying *Younger* may warrant abstention in civil matters as well. *See Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). In *Moore,* the Court noted that *Younger* principles of comity express:

> ... a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff. *Samuels v. Mackell,* 401 U.S. 66, 69 [91 S.Ct. 764, 766, 27 L.Ed.2d 688] (1971). That policy was first articulated with reference to state criminal proceedings, but as we recognized in *Huffman v. Pursue, Ltd.,* 420 U.S. 592 [95 S.Ct. 1200, 43 L.Ed.2d 482] (1975), the basic concern—that threat to our federal system posed by displacement of state courts by those of the National Government—is also fully applicable to civil proceedings in which important state interests are involved.

442 U.S. at 423, 99 S.Ct. at 2377.

The Supreme Court has not yet applied *Younger* abstention to state insurance liquidation proceedings. "[W]hile these proceedings are perhaps more remote from the criminal process than other proceedings in which *Younger* has been applied, [*see Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (enforcement of contempt proceedings); and *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (fiscal integrity of public assistance programs),] *Younger's* concerns with comity and with a state's enforcement of important state interests in its own courts seem equally applicable." *Levy, supra,* 635 F.2d at 965.

Defendants contend that this is not a case from which the Court should abstain on the basis of *Younger* and its progeny. In support of their argument, defendants mischaracterize, once again, this action as a "garden variety contract action ... through which plaintiff seeks a definite sum of money." D. Memo. Further Support at 36. Defendants ignore the fact that "[h]ere the state is a party to proceedings in its own courts [prior to defendants' removal], seeking to carry out regulatory duties left to it by Congress." *Levy, supra,* 635 F.2d at 965. There is more at stake here—the interests of policyholders and other creditors of Nassau; the interests of currently solvent insurers and parties interested in their financial well-being; and the interest of the State in maintaining an orderly system for regulating the insurance industry—than a simple contract dispute between an insolvent insurer and its reinsurer. Moreover, as was discussed at greater length during this Court's analysis of the *Burford* doctrine, defendants can raise their federal claims in the State Supreme Court, as well as in this Court. Thus, the Court finds that the principles of *Younger* also support abstention.

### 3. *Colorado River Abstention*

■ Plaintiff also argues that another category of abstention, that is recognized in *Colorado River, supra,* 424 U.S. at 800, 96 S.Ct. at 1236, is applicable here. "In *Colorado River,* the Supreme Court synthesized prior authority and announced a narrow exception to the duty of federal courts to exercise the jurisdiction granted to them." *Canady, supra,* 608 F.Supp. at 1473. The Court found that even in the absence of the other abstention doctrines, "federal courts ought to refuse to decide cases when considerations of '[w]ise judicial administration giving regard to conservation of judicial resources and comprehensive disposition of litigation,' ... require abstention." *Levy, supra,* 635 F.2d at 965 (quoting *Colorado River, supra,* 424 U.S. at 817, 96 S.Ct. at 1246) (citation omitted). The principle underlying *Colorado River* abstention is a prudential concern, "a second court with concurrent jurisdiction will exercise its discretion to defer to another court for the sake of comprehensive dispo-

sition of rights in a particular piece of property or in a fund." *Levy, supra,* 635 F.2d at 966.

The factors to be weighed by the federal courts in applying the *Colorado River* or "exceptional circumstances test" are:

1) The inconvenience of the federal forum;

2) Order in which jurisdiction was obtained by the forums;

3) Desirability of avoiding piecemeal litigation;

4) Presence or absence of substantial progress in the federal litigation;

5) Whether state or federal law provides the rule of decision on the merits; and

6) Adequacy of the state proceeding to protect the federal plaintiff's rights.

*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 15–16, 103 S.Ct. 927, 936–37, 74 L.Ed.2d 765 (1983) (citing, in part, *Colorado River, supra,* 424 U.S. at 818–19, 96 S.Ct. at 1246–47). These factors must not be applied mechanically, but instead should be balanced carefully, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.* at 16, 103 S.Ct. at 937.)

The Court notes that jurisdiction over this dispute was first obtained by the State Supreme Court when the Superintendent commenced this action on April 29, 1985. Defendants did not seek arbitration until after the action was filed. Moreover, defendants waited almost four months before removing this action to this Court. There has not been substantial progress in the federal litigation. On the other hand, the Superintendent does not contend that the federal forum is inconvenient. In any event, the other factors referred to by the Supreme Court in *Moses H. Cone* are more telling in this case.

Even prior to *Colorado River,* federal courts, in an effort to avoid piecemeal litigation, have deferred in cases involving disposition of assets of insolvent companies, especially in the context of the insurance industry. *See Levy, supra,* 635 F.2d at 966. The Circuit Court cited the "strong prudential reasons for requiring that all claims brought against a single fund or

pool of assets of an insolvent company should be heard in a single forum." *Id.* (citation omitted). Of course, this case does not directly involve claims against the Fund or against the assets of Nassau, as managed by the Superintendent; however, for the reasons discussed earlier, these same policy concerns are implicated here.

In addition to the need for unified proceedings for determining the disposition of Nassau's assets, the federal policy—embodied in the McCarran-Ferguson Act—of delegating the regulation of insurance companies to the states, augurs in favor of the exercise of abstention under the *Colorado River* doctrine. In addition, as explained during the analysis of the *Burford* doctrine, defendants cannot argue that proceedings before the State Supreme Court are not adequate to protect their rights regarding this dispute. Moreover, in light of the Superintendent's position that an adverse holding by the State Supreme Court with respect to his legal status under the contract would moot his objections to defendants' arbitration demand, the Court believes that abstention by this Court serves the prudential interests embodied by *Colorado River* abstention.

Defendants argue that *Colorado River* abstention is inappropriate in this case because it is federal law which provides the rule of decision in this case. However, as discussed previously, to determine whether or not the Convention applies to the instant dispute, the Court must first determine the status of the Superintendent. The determination of the powers of the Superintendent is a question of state law. The Supreme Court of the State of New York is in the best position to interpret New York law. Thus, this factor also argues in favor of abstention.

## CONCLUSION

For the aforementioned reasons, the Court hereby grants the Superintendent's motion seeking remand of this action to the New York State Supreme Court. The Court notes that its decision does not suggest anything concerning the merits of the Superintendent's claim for reinsurance pro-

ceeds under the Reinsurance Agreements. Nor should this decision be read to imply anything regarding the novel question of whether the McCarran-Ferguson Act, conjoined with New York's regulatory system for liquidating insolvent insurers, takes precedence over the Convention. This decision is limited to this Court deferring to the State Supreme Court to interpret an issue of state law, so the threshold question in this action, whether the Convention applies to this dispute can be answered in a more logical and efficient manner.

SO ORDERED.