UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2024

(Argued: May 14, 2025    Decided: July 2, 2025)

Docket No. 24-2209-cv

———————————————

MOLECULAR DYNAMICS, LTD., SDBM LIMITED,
CHAUNCEY CAPITAL CORP.,
*Petitioners-Appellants*,

v.

SPECTRUM DYNAMICS MEDICAL LIMITED, BIOSENSORS
INTERNATIONAL GROUP LTD.,
*Respondents-Appellees.*[1]

———————————————

Before:      SACK, WESLEY, AND ROBINSON, *Circuit Judges.*

Petitioners-Appellants were on the losing end of an arbitration held in Geneva, Switzerland, which resulted in the award of a substantial monetary sum, declaratory relief, and costs and attorneys' fees to Respondents-Appellees. In accord with an agreement between the parties that New York courts would have exclusive jurisdiction over all matters concerning the arbitration, Petitioners-Appellants filed a petition to vacate the arbitral awards in the U.S. District Court for the Southern District of New York. The district court (Katherine P. Failla, *Judge*) denied the petition, concluding that it lacked subject-matter jurisdiction to vacate the Swiss-made awards under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or the "Convention") because, in the district court's view, the awards may only be vacated in the country where they were made, Switzerland.

———————————

[1] The Clerk of Court is respectfully directed to amend the official caption as set forth above. Although the original case caption listed one of the Petitioners-Appellants as "SBDM Limited," the parties' briefs and exhibits contained in the appendices all refer to that party as "SDBM Limited," as the caption now reflects.

Plaintiffs-Appellants appealed to this Court, urging that the New York Convention does not command that all vacatur proceedings take place in the country that produced an award, and that the parties were free to contract for a non-Swiss forum to adjudicate issues arising from the arbitration.

We conclude, albeit on a basis different from that relied upon by the district court, that the court correctly determined that it lacked subject-matter jurisdiction over the petition to vacate. Chapter 2 of the Federal Arbitration Act endows a district court with subject-matter jurisdiction over "[a]n action or proceeding falling under the [New York] Convention." 9 U.S.C. § 203. The New York Convention concerns itself chiefly with the recognition and enforcement of arbitral awards in countries other than that in which an award was made. In what little it says about vacatur proceedings, it does not contemplate the species of action at bar, a petition to vacate a foreign-made arbitral award. Accordingly, we cannot conclude that Petitioners-Appellants' action "fall[s] under" the Convention, as required to avail the grant of subject-matter jurisdiction to federal district court contained in 9 U.S.C. § 203. We therefore AFFIRM the judgment of the district court.

CHARLOTTE V. BAIGENT (Scott M. Danner, Patrick J. Woods, *on the brief*), Holwell Shuster & Goldberg LLP, New York, NY, *for Petitioners-Appellants*;

DAVID N. CINOTTI (Sean J. Mack, Dominique Kilmartin, *on the brief*), Pashman Stein Walder Hayden P.C., Hackensack, NJ, *for Respondent-Appellee Spectrum Dynamics Medical Limited.*

FREDERICK L. WHITMER, Kilpatrick Townsend & Stockton LLP, New York, NY, *for Respondent-Appellee Biosensors International Group Ltd.*

SACK, *Circuit Judge*:

Petitioners-Appellants were on the losing end of an arbitration held in Geneva, Switzerland, which resulted in the award of a substantial monetary sum, declaratory relief, and costs and attorneys' fees to Respondents-Appellees. In accord with an agreement between the parties that New York courts would have exclusive jurisdiction over all matters concerning the arbitration, Petitioners-Appellants filed a petition to vacate the arbitral awards in the U.S. District Court for the Southern District of New York. The district court (Katherine P. Failla, *Judge*) denied the petition, concluding that it lacked subject-matter jurisdiction to vacate the Swiss-made awards under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or the "Convention") because, in the district court's view, the awards may only be vacated in the country where they were made, Switzerland. Plaintiffs-Appellants appealed to this Court, urging that the New York Convention does not command that all vacatur proceedings take place in the country that produced an award, and that the parties were free to contract for a non-Swiss forum to adjudicate issues arising from the arbitration.

We conclude, albeit on a basis different from that relied upon by the district court, that the court correctly determined that it lacked subject-matter jurisdiction over the petition to vacate. Chapter 2 of the Federal Arbitration Act (the "FAA") endows a district court with subject-matter jurisdiction over "[a]n action or proceeding falling under the [New York] Convention." 9 U.S.C. § 203. The New York Convention concerns itself chiefly with the recognition and enforcement of arbitral awards in countries other than that in which an award was made. In what little it says about vacatur proceedings, it does not contemplate the species of action at bar, a petition to vacate a foreign-made arbitral award. Accordingly, we cannot conclude that Petitioners-Appellants' action "fall[s] under" the Convention, as required to avail the grant of subject-matter jurisdiction to federal district court contained in 9 U.S.C. § 203. We therefore **AFFIRM** the judgment of the district court.

## BACKGROUND

### I. Factual Background[2]

#### A. The Joint Venture

This dispute arises from a failed joint venture in medical-imaging technology, Molecular Dynamics Ltd. ("Molecular Dynamics"). Molecular Dynamics was formed in October 2013 by Respondent-Appellee Biosensors International Group Ltd. ("Biosensors") and Petitioners-Appellants SDBM Limited ("SDBM") and Chauncey Capital Corp. ("Chauncey"). The joint venture was created through a series of contracts between Biosensors, SDBM, and Chauncey, including a Joint Venture and Investor Agreement (the "JV Agreement") and a License Agreement, among several others (collectively, the "Agreements"). Although Respondent-Appellee Spectrum Dynamics Medical Limited ("Spectrum") is not a party to the Agreements, in January 2017 it acquired all of Biosensors' rights and liabilities under the Agreements.

Under the JV Agreement, Molecular Dynamics and Biosensors were to share intellectual property to develop parallel but noncompeting medical-imaging technologies for use in different fields of medicine. As set forth in the

---

[2] To the extent that this opinion references facts contained in the sealed record, those portions of the record are unsealed.

License Agreement, Molecular Dynamics was to develop medical cameras for whole-body imaging, with specified applications in oncology. It was not to exceed this limited scope of business without the written approval of Biosensors, SDBM, and Chauncey. Biosensors, on the other hand, was permitted by the License Agreement to develop medical cameras for organ-specific imaging, and for applications to cardiology and medical specialties *other than* oncology. Other provisions of the Agreements spelled out loan and financing obligations.

Trouble arose in 2015 when Biosensors accused Molecular Dynamics of developing a camera focused on cardiology, in breach of the JV and License Agreements. In light of its view that Molecular Dynamics was acting beyond the scope of the Agreements, Biosensors refused to provide additional loans to Molecular Dynamics as called for by the Agreements. Biosensors and Molecular Dynamics met to resolve Biosensors' concerns but without success.

The relationship between Biosensors and Molecular Dynamics continued to sour over the next few years and by early 2017, owing in part to Biosensors' refusal to make further loans to Molecular Dynamics, Molecular Dynamics had ceased operations, becoming a shell company. In August 2017, Spectrum, which by that point had acquired Biosensors' rights and liabilities under the

6

Agreements, sent a notice to Molecular Dynamics that it was terminating the License Agreement because of Molecular Dynamics' alleged breach. Spectrum also demanded that Molecular Dynamics repay Spectrum the $7.5 million that Biosensors had loaned to the joint venture, with interest. Molecular Dynamics countered that Biosensors had breached the Agreements and its fiduciary obligations to the joint venture, causing Molecular Dynamics more than $100 million in damages. Molecular Dynamics also demanded that Biosensors cease and desist from developing a whole-body camera, which it was prohibited from doing by the License Agreement.

In October 2017, Spectrum introduced a medical camera called the Veriton. Molecular Dynamics maintained that the Veriton violated the terms of the License Agreement because it is a whole-body camera.

B.     The Parties' Arbitration, Forum Selection, and Choice-of-Law Agreements

The License Agreement—which, all parties agree, gives rise to the present proceedings, *see* Appellants' Br. at 7; Appellees' Br. at 17—contains arbitration, forum selection, and choice-of-law clauses. It states that the License Agreement "shall be governed by and construed in accordance with the laws of the State of

New York without regard to principles of conflicts of law."  Confidential App'x

at 44.  It further provides:

> Except for matters relating to injunctive relief, each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, exclusively to arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers' Arbitration Institution in force on the date on which the Notice of Arbitration is submitted in accordance with these Rules (the "Chosen Arbitration")….  The seat of the Chosen Arbitration shall be Geneva, Switzerland, unless the parties agree to another location.  The proceedings of the Chosen Arbitration shall be conducted in English.

*Id.*

All of the Agreements contain virtually identical provisions stating that they

are to be construed in accordance with New York law without regard to principles

of conflicts of law, and that any disputes relating to the Agreements are to be

resolved through arbitration seated in Geneva, Switzerland under "the Swiss

Rules of International Arbitration of the Swiss Chambers' Arbitration Institution."

*Id.* at 38-39.  The License Agreement also contains a clause that provides:

> On matters of injunctive relief, the parties agree that the courts of New York, New York shall have non-exclusive jurisdiction and are competent courts for the purposes thereof, and on matters of concerning the Chosen

8

> Arbitration, the courts of New York, New York will have exclusive jurisdiction thereupon.[3]

*Id.* at 44-45.

The License Agreement is the only one of the Agreements that contains such a provision.

C.     The Parties' Arbitration in Switzerland

In April 2018, Spectrum initiated an arbitration (the "Arbitration") against Molecular Dynamics, SDBM and Chauncey (together, "Petitioners-Appellants") before the Swiss Arbitration Centre in Geneva, Switzerland.  Spectrum, as Biosensors' successor in interest, sought repayment of Biosensors' $7.5 million loan to Molecular Dynamics, with interest, and a declaration that Spectrum lawfully terminated the License Agreement and was free to develop and market the Veriton whole-body camera and other future medical-imaging technologies. Petitioners-Appellants counterclaimed for breach of contract and breach of fiduciary duty, seeking $173.8 million in damages.  Petitioners-Appellants also moved to join Biosensors as a respondent to the counterclaim, which motion the

---

[3] A typographical error appears in the original License Agreement ("on matters <u>of</u> concerning the Chosen Arbitration . . ."). All parties and the district court seem to agree that it is an error and that the intended language is "on matters concerning the Chosen Arbitration . . . ." Hereafter, this opinion reproduces the language as "on matters [] concerning the Chosen Arbitration . . . ."

tribunal granted. All parties agreed that Geneva was the legal seat of the arbitration, that the Swiss Federal Statute on Private International Law supplied the procedural rules for the Arbitration, and that the Agreements are governed by New York law.

A seven-day hearing took place before a three-member arbitration panel in September and October 2020, at the close of which all parties confirmed that the tribunal had observed the requirements of due process. The panel's three members were Philip Allen Lacovara, chosen by Spectrum and Biosensors (together, "Respondents-Appellees"); Joel Adler, chosen by Petitioners-Appellants; and presiding arbitrator Albert Jan van den Berg, chosen by Lacovara and Adler. On March 17, 2021, after receiving post-hearing written submissions, the tribunal declared the proceedings closed.

In August 2021, while a draft award was circulating among members of the panel, Petitioners-Appellants made an application to reopen proceedings, claiming they had discovered new evidence regarding the Veriton camera. The tribunal denied the application. The following month, Petitioners-Appellants accused one of the panel members, presiding arbitrator van den Berg, of bias and conflicts of interest and later asked that he resign. Van den Berg withdrew from

the panel. Petitioners-Appellants then filed a challenge against the panel member they had selected, Adler, but they later withdrew that challenge. In December 2021, the tribunal appointed Jennifer Kirby as the new presiding arbitrator. Petitioners-Appellants expressed concerns that Kirby's potential exposure to the draft award that had been circulating before van den Berg's resignation could affect her ability to form an independent opinion of the case. Kirby assured the parties that she would not review or rely on the earlier draft award in developing her own draft. In May 2022, Petitioners-Appellants again sought to reopen the proceedings to submit additional evidence, which the tribunal again denied.

On May 18, 2022, the tribunal issued a 125-page Partial Award. The Partial Award found for Spectrum on its claims, rejected Petitioners-Appellants' counterclaims, and awarded Respondents-Appellees their costs and attorneys' fees. The Partial Award included a finding that Molecular Dynamics breached the License Agreement by developing a camera focused on cardiology, which was within Biosensors' exclusive field of use. This breach by Molecular Dynamics discharged Biosensors from its obligations under the License Agreement, freeing it to develop Veriton and other whole-body cameras.

11

Spectrum was entitled to repayment of the $7.5 million loan that Biosensors made to Molecular Dynamics, with interest, and Respondents-Appellees were entitled to approximately $6.9 million in costs and attorneys' fees. On July 8, 2022, the tribunal issued a Final Award granting additional costs and attorneys' fees to Respondents-Appellees.

## II.    Procedural Background

In June 2022, Petitioners-Appellants initiated this action in the United States District Court for the Southern District of New York by filing a petition to vacate the Partial Award. After the tribunal issued the July 2022 Final Award, Petitioners-Appellants filed an amended petition (the "Petition") to vacate both the Partial and Final Awards (together, the "Awards").

The Petition sought vacatur of the Awards pursuant to Section 10 of the FAA, 9 U.S.C. § 10, and the New York Convention. It asserted that "Respondents consented to [the district court's] jurisdiction over them by agreeing to a forum selection clause vesting exclusive jurisdiction over 'matters' 'concerning' the Arbitration in 'the courts of New York, New York.'" Confidential App'x at 177 ¶ 10.

The Petition alleged four bases for vacatur of the Awards, consistent with the grounds for vacatur enumerated in the FAA, 9 U.S.C. § 10(a): (1) that Respondents-Appellees suppressed evidence and caused their witnesses to perjure themselves in the Arbitration, thereby procuring an award by fraud or "undue" means; (2) that the chair of the tribunal resigned after allegations of partiality and that his replacement "did not adequately remedy the taint caused by the evidently partial chair's prior participation;" (3) that the tribunal refused to reopen the proceedings to hear newly discovered material evidence, prejudicing Petitioners-Appellants; and (4) that the Awards manifestly disregard New York law. Confidential App'x at 179-80. Finally, the Petition urged that to the extent Swiss law applied to the vacatur proceeding, "the grounds for setting aside an arbitral award under Swiss law are equally supportive of vacatur because those grounds are substantially the same as those embodied in the FAA." *Id.* at 180. Respondents-Appellees opposed the Petition.

The district court issued an Opinion and Order concluding that it lacked subject-matter jurisdiction to hear the vacatur petition and dismissed the case. *See Molecular Dynamics, Ltd. v. Spectrum Dynamics Med. Ltd.*, No. 22 Civ. 5167, 2024 WL 3523414 (S.D.N.Y. July 23, 2024). The court reasoned that under the

New York Convention, only courts of the country where an arbitral award is made—here, Switzerland—are empowered to vacate the award. *Id.* at *6-7. Courts in other countries are permitted only to refuse enforcement of a foreign-made award, and only if certain conditions are met. *Id.* at *6. Despite the provision of the License Agreement stipulating to exclusive jurisdiction in New York for "matters [] concerning the Chosen Arbitration," the district court rejected Petitioners-Appellants' argument that the New York Convention may be circumvented by contract to allow for vacatur proceedings outside the country that produced an award. *Id.* at *10. This timely appeal followed.

## STANDARD OF REVIEW

We note at the outset that this appeal is about subject-matter jurisdiction, by which we mean the district court's competence to hear a particular species of case. *See Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617 (2d Cir. 2019). As the Supreme Court has observed, "jurisdiction is a word of many, too many meanings." *Biden v. Texas*, 597 U.S. 785, 801 (2022).[4] There is subject-matter jurisdiction, of course, but there is also "jurisdiction" in a more general sense, referring to a court's power to "grant a particular remedy."

---

[4] In quotations from caselaw and the parties' briefing, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

14

*Id.* That range of meanings stretches even wider in the context of the New York

Convention, which, as explained below, contemplates certain countries having

"primary jurisdiction" and others having "secondary jurisdiction." *See CBF*

*Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 71 (2d Cir. 2017).

A confusion of those different meanings can, as it does here, obfuscate the

question at the heart of a case. The parties' briefs and the district court opinion

seem to toggle between definitions, sometimes speaking to whether the New

York Convention allows the district court to grant the relief that Petitioners-

Appellants seek—vacatur of the Swiss-made arbitral award—and at other times

speaking to the district court's ability even to hear the case, that is, whether it has

subject-matter jurisdiction over the petition to vacate. The former question is a

merits question, "something to be litigated and determined." *Reddy v. Buttar*, 38

F.4th 393, 399 (4th Cir. 2022). But the latter question "go[es] to *the power* of the

court to make the determination" in the first place. *Id.* (emphasis in original).

For the reasons that follow, we conclude that this appeal implicates the

district court's power to make a determination on Petitioners-Appellants'

petition to vacate, i.e., its subject-matter jurisdiction. And because subject-matter

jurisdiction is a "threshold question," it must be answered before any treatment

15

of a case's merits can be undertaken.  *See United States v. Prevezon Holdings Ltd.*,

839 F.3d 227, 235 (2d Cir. 2016).  We review questions of subject-matter

jurisdiction *de novo* and "are not limited in our right to refer to any material in

the record."  *Platinum-Montaur Life Scis.*, 943 F.3d at 616.  Although we agree with

the district court that it lacked subject-matter jurisdiction to hear this case, we

reach that conclusion by a different path.[5]

## DISCUSSION

### I.     The New York Convention

The New York Convention, drafted in New York under United Nations

sponsorship and opened for signature in 1958, reflects "the rapid expansion of

international trade following World War II" and the desire "to provide a

workable mechanism for the swift resolution of . . . day-to-day disputes" arising

from global business.  *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 929 (2d Cir.

1983); *see* Convention on the Recognition and Enforcement of Foreign Arbitral

Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (hereafter, "N.Y.

Convention").  Then, as now, "[i]nternational merchants often prefer[red]

---

[5] We note also that none of the parties squarely advance the position on subject-matter jurisdiction that we adopt here.  We, of course, "have the duty to determine whether subject matter jurisdiction exists even if the issue is not presented by the parties."  *Saint John Marine Co. v. United States*, 92 F.3d 39, 43 (2d Cir. 1996).

arbitration over litigation because it is faster, less expensive and more flexible."

*Bergesen*, 710 F.2d at 929. But international protocols predating the Convention

"had not proved effective in securing enforcement of arbitral awards." *Id.* So,

the "goal of the Convention, and the principal purpose underlying American

adoption and implementation of it, was to encourage the recognition and

enforcement of commercial arbitration agreements in international contracts and

to unify the standards by which agreements to arbitrate are observed and arbitral

awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417

U.S. 506, 520 n.15 (1974). The United States acceded to the New York Convention

in 1970. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless

USA, LLC*, 590 U.S. 432, 439 (2020). As of this year, 172 nations are parties to the

Convention. *See Contracting States*, New York Convention,

https://www.newyorkconvention.org/contracting-states (last visited June 13,

2025).

A.     <u>Recognition and Enforcement of Arbitral Awards under the Convention</u>

       The New York Convention expressly recognizes two classes of cases to

which it "shall apply." N.Y. Convention, art. I(1). First, it applies to "the

recognition and enforcement of arbitral awards made in the territory of a State

other than the State where the recognition and enforcement of such awards are

sought, and arising out of differences between persons, whether physical or legal." *Id.* This class of cases includes both arbitral awards made in a foreign country that a party seeks to recognize and enforce in the United States, and arbitral awards made in the United States that a party seeks to recognize and enforce in a foreign country.[6] *CBF Indústria*, 850 F.3d at 70. We have referred to the former category—arbitral awards made in a foreign country that a party seeks to recognize and enforce in the United States—as "foreign arbitral awards." *Id.*

Second, the Convention applies "to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." N.Y. Convention, art. I(1). We have called such awards "nondomestic arbitral awards."[7] *See CBF Indústria*, 850 F.3d at 73. The Convention's language

---

[6] An arbitral award is "made" in the country of the arbitral seat, "the jurisdiction designated by the parties or by an entity empowered to do so on their behalf to be the juridical home of the arbitration." Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration § 1-1 (oo) (Oct. 2024 Update); *see also CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 70 (2d Cir. 2017).

[7] We have observed that "[t]hese types of awards are sometimes referred to as *Bergesen* awards or U.S. Convention awards." *CBF Indústria*, 850 F.3d at 73; *see Bergesen v. Joseph Muller Corp.*, 710 F.2d 928 (2d Cir. 1983) (holding that the New York Convention applies to a U.S.-made arbitral award between two foreign entities). But this nomenclature appears limited to commentary contained in the Restatement (Third) of the U.S. Law of International Commercial Arbitration. A survey of the caselaw discloses that while a handful of district courts have used the term "U.S. Convention award" when quoting the Restatement, *see, e.g., Soleimani v. Andonian*, 21 Civ.

on nondomestic arbitral awards is somewhat indefinite. "[I]t was apparently left to each [signatory] state to define which awards were to be considered nondomestic." *Bergesen*, 710 F.2d at 933. Under United States law, a "nondomestic arbitral award" is one "that is 'made' in the United States because the parties agreed to arbitrate before an arbitrator in the United States" but which is either "made within the legal framework of another country, e.g., pronounced in accordance with foreign law," or "decided under the laws of the United States but involves either entities that are not U.S. citizens or . . . involves property located abroad, or envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *CBF Indústria*, 850 F.3d at 73. Stated more succinctly, the Convention applies to the recognition and enforcement in the United States of arbitral awards that, despite having been made in the United States, have some significant foreign nexus— what we call nondomestic arbitral awards.

The Convention provides that it applies to "the recognition and enforcement" of foreign arbitral awards, and to nondomestic arbitral awards "in

---

1018, 2022 WL 748246, at *7 (S.D.N.Y. Mar. 10, 2022), no court has used the term "*Bergesen* award" to describe a nondomestic arbitral award. In keeping with our earlier decisions, "we will use the term nondomestic arbitral award for the sake of precision." *CBF Indústria*, 850 F.3d at 73.

the State where their recognition and enforcement are sought."  N.Y.

Convention, art I(1).  The Convention, in other words, describes the two types of

arbitral awards to which it applies by reference to recognition-and-enforcement

proceedings.[8]  This is consistent with "the intended purpose of the treaty," which

is "to encourage the *recognition and enforcement* of international arbitration

awards."  *Bergesen*, 710 F.2d at 932 (emphasis added).

B.     Primary and Secondary Jurisdictions under the Convention

The Convention's directives on the recognition and enforcement of arbitral

awards yield only to the limited exceptions spelled out in Article V.  Article V

provides that the "[r]ecognition and enforcement of [an] award may be refused,

at the request of the party against whom it is invoked, only if that party furnishes

---

[8] "Recognition and enforcement" is a term of art in the New York Convention.  "Recognition" is the determination by a court that an arbitral award is binding and entitled to preclusive effect; "enforcement" is the reduction to a judgment of a foreign arbitral award.  *See* Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration §1.1(nn), (m); *see also Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 882 n.2 (11th Cir. 2023) ("Strictly speaking, recognition and enforcement are distinct legal concepts.").  Under the Convention, "recognition" and "enforcement" occur together, as a single process.  *See* N.Y. Convention, arts. I, III, IV, V.  The consolidation of "recognition" and "enforcement" into a single proceeding was, indeed, "the entire purpose of the New York Convention."  *CBF Indústria*, 850 F.3d at 72.  Its predecessor treaty, the Geneva Convention, "required an award first to be recognized in the rendering state before it could be enforced abroad."  *Id.* at 73.  This cumbersome two-step, known as the "double *exequatur*" requirement, forced the prevailing party in an arbitration to engage in at least two separate judicial proceedings: one in the country where the award was made and another in the country (or countries) where the party sought to enforce the award.  *See id.*

to the competent authority where the recognition and enforcement is sought,

proof that" one of several exigencies has transpired.  Relevant here, Article

V(1)(e) permits a court to refuse recognition and enforcement of an award where

that award "has been set aside or suspended by a competent authority of the

country in which, or under the law of which, that award was made."

Interpreting Article V(1)(e), courts in the United States have expounded a

framework that distinguishes between "primary" and "secondary" jurisdictions.

*See* Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration § 1.3.

"[T]he country in which, or under the arbitration law of which, an award was

made is said to have *primary* jurisdiction over the arbitration award."[9]  *Karaha*

*Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111,

115 n.1 (2d Cir. 2007) (emphasis in original).  The country with primary

jurisdiction is also sometimes referred to as the "legal seat" of the arbitration.  *See*

---

[9] Article V(1)(e)'s language "under the law of which" is widely understood to refer to "the regimen or scheme of arbitral procedural law under which the arbitration was conducted, and not the substantive law . . . which was applied in the case."  *Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Indus. y Comercial*, 745 F. Supp. 172, 178 (S.D.N.Y. 1990); *see also Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 n.3 (2d Cir. 1997); *Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181, 1192 (10th Cir. 2021); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 731 (D.C. Cir. 2012); *Steel Corp. of Philippines v. Int'l Steel Servs., Inc.*, 354 F. App'x 689, 692 (3d Cir. 2009) (summary order); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 289 (5th Cir. 2004); *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 849 (6th Cir. 1996).

21

*Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 883 (11th Cir. 2023).

By contrast, "[a]ll other signatory States [to the Convention] are *secondary* jurisdictions." *Karaha Bodas*, 500 F.3d at 115 n.1 (emphasis in original). To illustrate, if an arbitral award is made in Canada pursuant to Canadian arbitral law, then Canada—and, by extension, its courts—has primary jurisdiction over that award, even if the arbitrator applied, say, Connecticut law to questions of contract interpretation. Every other country that is party to the Convention has only secondary jurisdiction over the award.[10]

The distinction between primary and secondary jurisdictions is material because review of an arbitral award by a court in the primary jurisdiction is governed by a "very different regime[]" than review of an arbitral award by a court in a secondary jurisdiction. *See Yusuf Ahmed Alghanim & Sons v. Toys "R"*

---

[10] Parties to an arbitration agreement could, in theory, designate country X as the venue for arbitration while designating country Y's arbitration law as the governing procedural authority. In that scenario, country Y would have primary jurisdiction as "the state that supplied the arbitral law under which the award was made." *See Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 21 n.3. But the fission of arbitral venue and procedure appears to be an exceedingly rare practice and no party to this appeal claims that it occurred here. *See, e.g., id.* ("Although most courts and commentators assume that Article V(1)(e) [of the Convention] is applicable to the state in which the award is rendered, we note that Article V(1)(e) specifically contemplates the possibility that an award could be rendered in one state, but under the arbitral law of another state . . . . This situation may be so rare as to be a 'dead letter.'").

*Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). Article V(1)(e) "specifically contemplates that the state [having primary jurisdiction] will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Id.* Accordingly, "a party may seek to vacate or set aside an award" in a court of the primary jurisdiction, and the petition to vacate will be "governed by [that state's] domestic law." *Id.*; *see also, e.g.*, *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) ("Because the Award in the St. Paul Arbitration *was entered in the United States . . . the domestic provisions of the FAA also apply* [to the motion to vacate], as is permitted by Articles V(1)(e) and V(2) of the New York Convention." (emphasis added)).

But in a secondary jurisdiction, a court may only *decline to enforce* an arbitral award and may do so based "only on the limited grounds specified in Article V [of the Convention]." *Karaha Bodas*, 500 F.3d at 115 n.1. While courts of primary jurisdiction "have much broader discretion to set aside an award," Article V delimits the bases on which courts of secondary jurisdiction "may refuse enforcement" of an arbitral award, assuming "the party contesting

23

enforcement provides proof sufficient to meet one of the bases for refusal."[11]  *Id.*;

*see also Corporación AIC*, 66 F.4th at 883 ("Under the New York Convention, only

courts in the primary jurisdiction can vacate an arbitral award.").  And the legal

---

[11] Those bases for refusal are:

> (a) The parties to the [arbitration] agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
>
> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
>
> (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

N.Y. Convention, art. V(1).  A court in a country of secondary jurisdiction may also refuse recognition and enforcement of an award if it concludes that "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country" or "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."  *Id.*, art. V(2).

24

effect of a secondary jurisdiction's denial of recognition and enforcement is limited to that jurisdiction. *See Corporación AIC*, 66 F.4th at 884. Conversely, pursuant to Article V(1)(e), vacatur of an award by the primary jurisdiction "has legal consequences internationally, as it is a ground on which recognition and enforcement of the vacated award may be refused by a court in a secondary jurisdiction." *Id.* at 883; *see also Zeiler v. Deitsch*, 500 F.3d 157, 165 n.6 (2d Cir. 2007) (noting that vacatur in the primary jurisdiction "can affect the remaining force of an unconfirmed award outside [the primary jurisdiction], if a party seeks to confirm and enforce the award under the Convention abroad").

This limitation on the power of courts of secondary jurisdiction necessarily implies a limitation on the parties that appear before them. In a secondary jurisdiction, "[p]arties can only contest whether that [jurisdiction] should enforce the arbitral award," *Karaha Bodas*, 500 F.3d at 115 n.1, meaning that the party that prevailed in arbitration must first initiate a recognition-and-enforcement action before the losing party may contest the award. Under Article V, only *after* an award has been "invoked" against a party may that party urge the court to refuse recognition and enforcement. *See, e.g.*, *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1263 (11th Cir. 2011) ("Article V applies at the award-enforcement stage.");

*Estate of Ke v. Yu*, 105 F.4th 648, 654 (4th Cir. 2024) ("[*I*]*n response* [to a recognition-and-enforcement action], the party against whom the foreign award was entered may argue for a refusal of confirmation and enforcement." (emphasis added)). The New York Convention therefore envisions a mostly limited, reactive role for the losing party in an arbitration.

The text of the Convention brooks a single departure from this presumption. Article V(1)(e) acknowledges that an award may be "set aside or suspended by a competent authority" of the primary jurisdiction. Relatedly, Article VI provides that "[i]f an application for the setting aside or suspension of [an] award has been made to a competent authority" of the primary jurisdiction, a court in a secondary jurisdiction may stay recognition-and-enforcement proceedings pending a decision on the vacatur application. Because we think it highly unlikely that the winner in arbitration would apply "for the setting aside or suspension of the award," we read these provisions of the Convention to imply that the losing party may initiate vacatur proceedings in the primary jurisdiction.[12] And, as we have said, such a proceeding may avail itself of the

---

[12] We use "losing party" here as shorthand for the party resisting compliance with the terms of an arbitral award. We recognize that the rare arbitral award may "split the baby" such that neither party feels it has fully prevailed. Even rarer, we suspect, there may be circumstances in which the losing party in an arbitration is the party that seeks recognition and enforcement of

primary jurisdiction's "domestic arbitral law and its full panoply of express and implied grounds for relief." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23. Thus, despite the Convention's general emphasis on recognition-and-enforcement proceedings—proceedings initiated by the winner in arbitration—Articles V and VI admit a discrete carve-out for vacatur proceedings in the primary jurisdiction initiated by the losing party.[13]

C.    Implementation of the Convention in the Federal Arbitration Act

Shortly after the United States acceded to the New York Convention in 1970, Congress enacted implementing legislation as Chapter 2 of the Federal Arbitration Act ("FAA").[14] *See GE Energy Power Conversion France SAS*, 590 U.S.

---

the award in a secondary jurisdiction, perhaps to hasten the dispute's conclusion with the finality of a court judgment. But because voluntary compliance with an arbitral award would seemingly obviate the need for *any* enforcement proceeding under the New York Convention, we think it fair to assume that the party resisting compliance in an action brought under the Convention will almost always be the party that was defeated in arbitration.

[13] Federal arbitration law uses the terms "vacate" and "vacatur" to describe when an award is invalidated. *See, e.g.*, 9 U.S.C. § 10. The New York Convention uses the terms "set aside" and "suspend," and some foreign jurisdictions use the term "annul." For consistency, we will use "vacate" and "vacatur" unless quoting the Convention, but we note that "[s]et aside, suspend, and annul under the New York Convention are . . . generally interchangeable with vacatur under the FAA." *Corporación AIC*, 66 F.4th at 882-83; *see also* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 1.1, cmt. pp ("In general, the Restatement treats the terms 'vacate,' 'set aside,' and 'annul' as synonymous.").

[14] Several of our sister Circuits have referred to the legislation implementing the New York Convention, now codified at Chapter 2 of Title 9 of the U.S. Code, as the "Convention Act." *See, e.g.*, *CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC*, 8 F.4th 1007, 1011 (9th Cir.

at 439; 9 U.S.C. §§ 201-208. "[T]he FAA and the New York Convention work in tandem, and they have overlapping coverage to the extent that they do not conflict." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 102 n.1 (2d Cir. 2006). We therefore read the Convention and the FAA together, rather than separately and apart, to determine how the two sources of law coalesce.

## II. Subject-Matter Jurisdiction

This brings us to the issue of subject-matter jurisdiction. Petitioners-Appellants argue that one of the FAA's provisions implementing the New York Convention, 9 U.S.C. § 203, provides the district court with the necessary grant of subject-matter jurisdiction over their petition to vacate the Swiss-made Awards under the FAA's statutory grounds for vacatur contained in 9 U.S.C. § 10.[15] We disagree, concluding that the district court lacked subject-matter jurisdiction to hear this case.

---

2021); *Suazo v. NCL (Bahamas), Ltd.*, 822 F.3d 543, 545 (11th Cir. 2016); *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 272 (5th Cir. 2002). We refer to it simply as Chapter 2 of the FAA.

[15] Petitioners-Appellants do not allege any alternative basis for the district court's exercise of subject-matter jurisdiction.

First, however, we recite the unremarkable but foundational principle of our system of federal courts that they are "courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). In deference to these strict parameters, "[t]here is always a presumption against jurisdiction" in the federal courts. *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 64 (2d Cir. 2012). "[T]he district courts may not exercise jurisdiction absent a statutory basis," *Exxon Mobil*, 545 U.S. at 552, and accordingly, "parties may not confer subject matter jurisdiction on the court by consent," *Cable Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91, 94 (2d Cir. 1992). With these tenets in mind, we consider whether Chapter 2 of the FAA, read alongside the New York Convention that it implements, affords the district court the requisite statutory basis for subject-matter jurisdiction here.

"The FAA is 'something of an anomaly in the realm of federal legislation: It bestows no federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute.'" *Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019) (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009)). One such "independent jurisdictional basis" is found at 9

U.S.C. § 203: "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."[16]

Therefore, to determine whether the district court "shall have original jurisdiction" over the present action, we must decide whether it is an action that "fall[s] under the Convention." We conclude that it is not.

We start with the Convention itself. By its plain text, it "shall apply to the *recognition and enforcement* of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought" (i.e., foreign arbitral awards) and "to arbitral awards not considered as domestic awards in the State where their *recognition and enforcement* are sought" (i.e., nondomestic arbitral awards). N.Y. Convention, art. I (emphasis added). Petitioners-Appellants' vacatur action does not fall within either of those classes. While the case does involve foreign arbitral awards made in Switzerland,

---

[16] The grant of subject-matter jurisdiction in 9 U.S.C. § 203 mirrors the grant of federal-question jurisdiction in 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *See Reddy v. Buttar*, 38 F.4th 393, 398 (4th Cir. 2022).

Petitioners-Appellants do not seek the recognition and enforcement of those awards in these proceedings. To the contrary, they initiated this action in federal court to *vacate* the Awards, not to recognize and enforce them. Nor does this appeal involve a nondomestic arbitral award, which we have generally defined to mean a U.S.-made award with some substantial foreign nexus. *See CBF Indústria*, 850 F.3d at 73. No party contends otherwise.

To be sure, the Convention also applies to "*necessary* ancillary proceedings that ensure the proper functioning of the underlying arbitration." *Jones Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F. 4th 1131, 1139 (9th Cir. 2022) (emphasis in original); *see also Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 391 n.6 (2d Cir. 2011) (explaining that "the Convention should be interpreted broadly to effectuate its *recognition and enforcement purposes*" (emphasis added)). For example, federal courts have subject-matter jurisdiction to enforce summonses compelling witnesses to appear at an arbitration hearing, *Jones Day*, 42 F.4th at 1134, 1139; to attach property to "ensur[e] that assets from which an arbitration award would be satisfied are secured while arbitration is pending," *Stemcor USA Inc. v. CIA Siderurgica do Para Cosipar*, 927 F.3d 906, 910 (5th Cir. 2019) (quoting *China Nat. Metal Prods. Imp./Exp. Co. v. Apex Digital, Inc.*, 155 F. Supp. 2d 1174,

31

1180 (C.D. Cal. 2001)); and to issue preliminary injunctions sought during the pendency of an underlying arbitration, *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 825–26 (2d Cir. 1990). These sorts of proceedings that are consistent with the Convention's "provisions and its spirit" of ensuring enforcement of international commercial arbitration agreements also fall under the Convention. *Id.* at 826.

And, as explained above, the Convention *does* address vacatur proceedings initiated by the losing party in arbitration, but it specifically envisions that they will be decided by a "competent authority of the country in which, or under the law of which, that award was made." N.Y. Convention, art. V(1)(e); *see also id.*, art. VI. Beyond this limited carve-out, however, the Convention is silent on vacatur. Petitioners-Appellants interpret this silence as permissive, concluding from it that "parties can designate a single forum for post-award proceedings including vacatur, other than the default primary jurisdiction." Appellants' Br. at 13.

But we think the silence supports a different conclusion. The Convention's "goal" and "the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of

commercial arbitration agreements . . . and to unify the standards by which agreements to arbitrate are observed and arbitral awards are *enforced* in the signatory countries." *Scherk*, 417 U.S. at 520 n.15 (emphasis added). The Convention was not intended to provide a vehicle for the second-guessing and invalidation by one jurisdiction of arbitral awards generated in another; it was designed to enhance the portability of awards by streamlining the process by which they could be recognized and enforced abroad. *See CBF Indústria*, 850 F.3d at 72–73; *see also Reddy*, 38 F.4th at 398 ("Fundamentally, [the Convention] sets forth standards for the *observance and enforcement of arbitration awards* and requires signatory states to *recognize and enforce such arbitration awards* from other states." (emphasis added)). We do not think that the Convention's general silence on vacatur is a gap to be filled by domestic law or private contract, but a clear indication that vacatur is not among the mechanisms that the Convention is designed to regulate. By mentioning *only* vacatur proceedings held in the primary jurisdiction, the Convention limits its scope to actions intended to enforce, not invalidate, arbitral awards.

The Convention simply does not speak to the type of action Plaintiffs-Appellants have brought. The Awards at issue here were made in and under the

arbitral law of Switzerland, the primary jurisdiction. Petitioners-Appellants' vacatur action in a U.S. district court, a court of secondary jurisdiction, is not the type of proceeding that the Convention addresses. Therefore, 9 U.S.C. § 203, which provides the district court with subject-matter jurisdiction for "action[s] or proceeding[s] falling under the Convention," is not satisfied here. The text of the Convention—which only describes vacatur by "a competent authority of the country in which, or under the law of which, [an] award was made," N.Y. Convention, art. V(1)(e)—offers nothing for Petitioners-Appellants' vacatur action to "fall under."

Petitioners-Appellants urge that the district court possesses subject-matter jurisdiction based on another section of Chapter 2 of the FAA, 9 U.S.C. § 202. That section states, "An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial … falls under the Convention." *Id.* Taken out of context, this language might well be read to sweep in the award at issue here, which "aris[es] out of a legal relationship" and "is considered as commercial."

But we do not read 9 U.S.C. § 202 in a vacuum. As with 9 U.S.C. § 203, we consider it alongside the text of the Convention. *See Sole Resort*, 450 F.3d at 102

n.1.  The language of Section 202 mirrors the language contained in Article I(3) of the Convention, which provides that "[w]hen signing, ratifying or acceding to this Convention, . . .  any State may . . . declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration."  Article I(3) "gives contracting nations discretion to limit the [Convention's] application to commercial relationships," as opposed to, say, arbitrations in the family law arena.  *Green Enters., LLC v. Hiscox Syndicates Ltd. at Lloyd's of London*, 68 F.4th 662, 668 (1st Cir. 2023).  While the commercial-relationship reservation of Article I(3) "has not been the subject of detailed elaboration by courts in the United States," Restatement (Third) U.S. Law of Int'l Comm. Arb. § 1.1 n.e, "[w]e may logically speculate that it was to exclude matrimonial and other domestic relations awards, political awards, and the like," *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y.), *aff'd*, 489 F.2d 1313 (2d Cir. 1973).

When the United States acceded to the Convention, it filed a declaration that it intended to limit the Convention to legal, commercial relationships.  *See Francisco v. Stolt Achievement MT*, 293 F.3d 270, 275–76 (5th Cir. 2002) (citing 1970

Senate testimony by the chairman of a State Department advisory committee).

Congress subsequently codified that commitment at 9 U.S.C. § 202. *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1153 (9th Cir. 2008); *see also Bautista v. Star Cruises*, 396 F.3d 1289, 1296 (11th Cir. 2005) ("When the United States acceded to the Convention in 1970, it exercised its right to limit the Convention's application to commercial legal relationships as defined by the law of the United States."); *Siderius, Inc. v. Compania de Acero del Pacifico, S.A.*, 453 F. Supp. 22, 24 n.1 (S.D.N.Y. 1978) ("The United States acceded to the Convention with the reservations set forth in Article I, Section 3.").

We therefore read 9 U.S.C. § 202 to establish that Congress accepted the Convention's invitation to limit its application to commercial disputes within the classes of recognition and enforcement actions described in Article I(1), or vacatur actions described in Article V(1)(e). But 9 U.S.C. § 202 does not set forth additional classes of cases that "fall[] under the Convention," because that construction would expand the reach of the Convention to include classes of cases beyond those to which the Convention, by its own terms, applies. *See* N.Y. Convention, art I(1); art. V. Petitioners-Appellants' construction of Section 202 would be a misreading of the statute because it would enlarge the treaty that

Chapter 2 of the FAA purports only to enforce. *See* 9 U.S.C. § 201 ("The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.").

\* \* \* \* \*

We understand Chapter 2 of the FAA along with the New York Convention to convey to the federal courts subject-matter jurisdiction over actions to recognize and enforce foreign or nondomestic arbitral awards, and to actions to vacate awards made in or under the laws of the United States that also have some significant foreign nexus, so long as the subject awards arise out of a legal relationship and are commercial in nature. Because the present action does *not* comport with the "provisions and . . . spirit" of the Convention, *Borden*, 919 F.2d at 826, and because Petitioners-Appellants offer no alternative ground for the exercise of subject-matter jurisdiction, we conclude that the district court lacked subject-matter jurisdiction.

We do not decide today whether, as Petitioners-Appellants urge, parties to an international arbitration may, consistent with the New York Convention, designate by contract one country as the arbitral seat and another as the venue

for vacatur proceedings.  We hold instead that the present action—a petition to vacate a foreign arbitral award—does not "fall under" the Convention, and therefore that 9 U.S.C. § 203 does not supply the necessary grant of subject-matter jurisdiction to the district court.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.