**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1350**

EMPLOYERS' INNOVATIVE NETWORK, LLC; JEFF MULLINS,

        Plaintiffs – Appellants,

   v.

BRIDGEPORT BENEFITS, INC., a foreign corporation; CAPITAL SECURITY, LTD., a foreign corporation; UNIVERSAL RISK INTERMEDIARIES, INC., a foreign corporation; VOLUNTARY BENEFIT SPECIALISTS, LLC, a foreign limited liability company; STEPHEN SALINAS, individually; WAYNE BLASMAN, individually; JEANA NORDSTROM, individually; CASEY BLASMAN, individually,

        Defendants – Appellees.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Frank W. Volk, Chief District Judge.  (5:18-cv-01082)

Argued:  December 10, 2024                          Decided:  July 18, 2025

Before DIAZ, Chief Judge, and AGEE and RICHARDSON, Circuit Judges.

Vacated and remanded by published opinion.  Judge Richardson wrote the opinion, in which Chief Judge Diaz and Judge Agee joined.

**ARGUED:** Joseph Alexander Ford, SPILMAN THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Appellants.  Jamison Hall Cooper, COOPER LAW OFFICES, Bridgeport, West Virginia; Riddhi Dasgupta, TAFT STETTINIUS &

HOLLISTER LLP, Washington, D.C., for Appellees. **ON BRIEF:** Daniel C. Cooper, COOPER LAW OFFICERS, PLLC, Bridgeport, West Virginia, for Appellees Capital Security, Ltd., Universal Risk Intermediaries and Jeana Nordstrom.

RICHARDSON, Circuit Judge:

Appellants and Appellees sought to settle a dispute through an arbitration conducted in Bermuda. Appellees won in that arbitration. They then asked a federal district court to recognize and enforce their arbitral award in the United States under Chapter 2 of the Federal Arbitration Act ("FAA"), and the court below agreed. Appellants, who lost in arbitration, now ask us to reverse the district court and decline to recognize and enforce the arbitral award. We cannot do so—but neither can we affirm. While the parties before us fight by the rules of Chapter 2, the record leaves open the possibility that their skirmish is instead governed by the differing rules of Chapter 1. We thus vacate and remand for further factfinding to determine which rules apply.

## I.      Background

This voyage began with a set of contracts. In 2016, Employers' Innovative Network, a company that provides human resource services to other companies, sought a new health insurance policy to cover its existing employee healthcare benefit plan. To that end, the company and its president, Jeff Mullins—the appellants in this case—entered into a set of contracts with Bridgeport Benefits, Inc., Capital Security, Ltd., and a few other parties, who make up the appellees in this case. Appellees are service providers that set up and administer health insurance plans, among other things.[1]

---

[1] Neither the parties nor the district court provided a full summary of the underlying business relationship between the parties. For reasons that will become clear, the district court may need to analyze that relationship on remand.

For reasons that are irrelevant to this appeal, the relationship between the parties quickly soured. So in April 2018, Appellants sued Appellees in West Virginia state court. The complaint contained a bevy of claims, including claims for breach of contract, fraud, slander, and a statutory claim under the West Virginia Unauthorized Insurers Act. Shortly afterward, Appellees removed the case to federal court.

But the case didn't stay there long. Although removal to federal court was proper, one of the parties' contracts stated that "any dispute controversy or claim arising out of" their contract was to be resolved by arbitration in Bermuda under Bermudian contract law. J.A. 702. So the district court stayed the case pending the parties' arbitration, and into the Atlantic this case sailed.

### A.    The Parties Arbitrate In Bermuda

In November 2019, the Chartered Institute of Arbitrators, Bermuda Branch, provided the parties with the names of three potential arbitrators. All three, however, had conflicts of interest and were disqualified. The Bermuda Arbitration Institute recommended four more potential arbitrators. From that list, the parties chose Delroy Duncan. At the time, neither side objected.

Appellants lost in arbitration. Thinking that Duncan's conduct at arbitration reflected bias, they investigated him after the fact and claimed that Duncan had conflicts of interest which compromised his impartiality.[2] They raised these potential conflicts with

---

[2] The alleged conflicts stem from a concurrent lawsuit. Before Duncan was appointed arbitrator, Duncan's law firm, Trott & Duncan, had been sued by Fidelity National Title Insurance Company. In that suit, Fidelity was represented by Keith (Continued)

4

Duncan after the final award, but Duncan did not respond to their complaint. They then filed a formal challenge asking him to withdraw and sought a do-over with a different arbitrator. In response to the formal challenge, Duncan denied that he was conflicted and declined to withdraw.

Appellants then formally appealed his refusal to the Bermuda Arbitration Institute. The Institute sided with Duncan, finding that his undisclosed relationship was not "likely to give rise to justifiable doubts as to Mr. Duncan's impartiality and independence." J.A. 1657. The Bermuda Arbitration Institute felt that the premise of the challenge was "highly implausible." *Id.* Appellants declined to exercise their right to appeal the decision to the Bermuda Supreme Court.

## B.      The District Court Enforces The Arbitral Award

With the arbitration finished, this dispute escaped the dreaded triangle and found its way back to the mainland. Armed with a favorable arbitration decision, Appellees moved in the Southern District of West Virginia to enforce their arbitral award under Chapter 2 of the FAA. 9 U.S.C. §§ 201 *et seq.* Chapter 2 is a set of statutes enacted to enforce an international treaty known as the "New York Convention," which facilitates the recognition and enforcement of certain arbitral awards. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *adopted* June 10, 1958, 21 U.S.T. 2517, 330

---

Robinson—who was counsel for some of the appellees in the arbitration at issue. Additionally, in the Fidelity suit, Duncan's firm was represented by Katie Tornari, the Vice Chairman of the Bermuda Arbitration Institute who had selected Duncan to preside over the arbitration at issue. Furthermore, there was a claim in the suit that Duncan and his partners could be personally liable for nearly $19 million in total damages. Finally, Duncan was aware of the Fidelity litigation, and served as Director of Trott & Duncan.

U.N.T.S. 38 (entered into force with respect to the United States Dec. 29, 1970). In response, Appellants argued the district court should refuse to recognize the validity of the arbitral award because enforcing the award would go against the public policy of the United States, which provides a defense to enforcement under Article V(2)(b) of the New York Convention as implemented through Chapter 2.

The district court granted Appellees their second win and ordered the enforcement of the arbitral award. *Emps.' Innovative Network, LLC v. Bridgeport Benefits, Inc.*, 2024 WL 1160321, at *7 (S.D.W. Va. Mar. 18, 2024). The district court observed that the New York Convention recognizes only seven defenses to the enforcement of arbitral awards, and that the seventh "public policy" defense Appellants relied on was "narrow." *Id.* at *5. In the district court's view, the public policy defense failed at the threshold because Appellants waived the argument, having failed to appeal the Bermuda Arbitration Institute's decision on Duncan's bias to the Bermuda Supreme Court. *Id.* at *6–7. The district court also held that even if the defense were not waived, the alleged facts did not show that Duncan was sufficiently biased. *Id.* at *7.

Appellants timely appealed.

## II.    Discussion

Appellants ask us to do what the district court did not: refuse to recognize and enforce the arbitral award on account of Duncan's alleged bias. Although we agree that

6

Appellants did not waive their argument,[3] we do not reach the merits of their theory. Instead, we grapple with the antecedent question of whether Chapter 2 applies at all—or whether the parties' central dispute is governed by provisions from a different chapter of the FAA. Because we cannot tell from the sparsely developed record, we vacate and remand for the district court to conduct further factfinding.[4]

### A.     The Structure Of The Federal Arbitration Act

To understand the uncertainty over which chapter governs this case, we need to first lay out the structure of the FAA and the scope of each chapter. Bear with us—the FAA is not a triumph of legislative draftsmanship.

The FAA governs the enforcement of arbitral awards by federal courts. It is divided into four chapters, each of which governs different types of arbitrations. The fourth chapter prevents arbitration agreements from being enforced against a party alleging sexual harassment or sexual assault under federal, state, or tribal law; it has no bearing on this

---

[3] Appellants' failure to appeal the Bermuda Arbitration Institute's decision to the Bermuda Supreme Court was not a waiver of their right to argue against enforcement in this suit. Whether or not they exhausted their appellate remedies in the *arbitral process* does not affect their ability to object to the arbitral award in this separate and subsequent *enforcement process*. The latter is governed by the FAA, which does not condition the ability to oppose enforcement of an arbitral award on exhaustion. §§ 2, 10, 202, 207, 302.

[4] No party raised the possibility that the suit was governed by a different chapter. But we "retain[] the independent power to identify and apply the proper construction of governing law." *Wideman v. Innovative Fibers LLC*, 100 F.4th 490, 494 n.3 (4th Cir. 2024) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)). After all, "[i]t is our duty to interpret the law, and party presentation principles do not override that ultimate duty." *Roberts v. Carter-Young*, 131 F.4th 241, 249 n.2 (4th Cir. 2025). Given the uncertainty of the issues before us and the potential impact on the parties' rights, that duty compels us to seek clarification through remand.

7

case.  9 U.S.C. § 402.  We instead focus on the scope of the first three chapters, which cover distinct but overlapping sets of "commercial" arbitrations.  §§ 2, 202, 302.

Start with the scope of Chapter 1.  It governs arbitration agreements found in "maritime transaction[s]" and "contract[s] evidencing a transaction involving commerce." § 2.  "Maritime transactions" are defined to primarily refer to contracts at sea;  "commerce" is defined to sweep in interstate and foreign commerce.  § 1.  Putting the definitions together, it is reasonable shorthand to say that Chapter 1 covers arbitration agreements in commercial contracts, wherever they occur.[5]  For the commercial contracts within its scope, Chapter 1 provides a set of rules for how arbitration is to be conducted, including rules for when to stay court proceedings pending arbitration, how to appoint arbitrators, and which documents are required in various filings, among others.  §§ 3, 5, 13.

The scope of Chapter 2 is more complex.  It contains a nested three-part structure: a *baseline* scope of Chapter 2's coverage, a *carveout* where Chapter 2 does not apply, and then an *exception* to the carveout where Chapter 2 applies again.  Starting at the baseline, Chapter 2 states that it governs arbitration agreements and arbitral awards "arising out of a

---

[5] Three minor points of clarification to the shorthand.  First, Chapter 1 does not cover employment contracts for transportation workers.  *See* § 1 (exempting "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce");  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001) (confining the catchall to transportation workers).  Second, Chapter 1 does not cover "contracts made prior to January 1, 1926."  § 14.  And third, despite containing statutory provisions that reference arbitral awards "made" in a "district," § 9–11, Chapter 1 *does* cover arbitrations conducted outside the United States.  Those provisions—which govern the confirmation, vacatur, and modification of arbitral awards—only establish permissive venue rules and do not constrain Chapter 1's scope.  *See Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 202–04 (2000).

8

legal relationship, whether contractual or not, which is considered as commercial." § 202. The sweep of "legal relationship" expressly includes any commercial contract that falls within the scope of Chapter 1.[6]  *Id.*  Next, Chapter 2 carves out from its baseline scope any "agreement or award arising out of such a relationship which is entirely between citizens of the United States."  *Id.*  The statute clarifies that "a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States."  *Id.* Finally, Chapter 2 defines an exception to the carveout such that even when the legal relationship is entirely between citizens of the United States, Chapter 2 will apply when "that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states."  *Id.*

One oddity of Chapter 2's scope worth mentioning is that it is derived solely from the statutory text of § 202.  For an ordinary statute, that would be the norm.  But Chapter 2 is an implementing statute for the New York Convention, an international treaty on arbitration.  *See* § 201 ("The [New York Convention] shall be enforced in United States courts in accordance with this chapter.").  Implementing statutes are intended to "carry [preexisting treaties] into effect" when enacted.  *See Medellín v. Texas*, 552 U.S. 491, 505 (2008) (quoting *Whitney v. Robertson*, 124 U.S. 190, 194 (1888)).  This is why some of Chapter 2's rules are not laid out in the statutory text itself but are instead incorporated by reference to the New York Convention.  *See, e.g.*, § 207 ("The court shall confirm the

---

[6] Because a contract exists between the parties here, we need not speculate about what forms of legal relationships exist that are commercial yet noncontractual such that they would fall inside the baseline of Chapter 2 but outside the scope of Chapter 1.

9

award unless it finds one of the grounds for refusal . . . specified in the said Convention.").

So one might think that the scope of Chapter 2 would simply be the scope of the New York Convention, which covers arbitral awards made in a foreign state and arbitral awards made at home "but not considered as domestic" by law.[7]  *See* New York Convention, art. I(1). But that is not the case.  Instead, the text of § 202 lays out its nested three-part structure, seen nowhere in the Convention, and then states that arbitrations that fall within the first and third portions of that structure are enforceable under Chapter 2—whether those arbitrations are covered by the Convention's own terms or not.  *See ESAB Grp., Inc. v. Zurich Ins.*, 685 F.3d 376, 382 (4th Cir. 2012).[8]

---

[7] Here's more detail on the scope of the New York Convention.  First, the New York Convention "appl[ies] to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York Convention, art. I(1).  In determining where an arbitration is conducted, courts generally look to the "arbitral seat"—a technical concept that depends on where the arbitrator formally sits.  *See* Restatement of the U.S. L. of Int'l Com. and Inv.-State Arb. § 1.1(*oo*) & cmt. dd (Am. L. Inst. 2023) [hereinafter "Restatement"].  From the perspective of American courts, this provision covers all and only those arbitrations conducted abroad and sought to be enforced in the United States.  *See, e.g.*, *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983).  Second, the New York Convention also applies to arbitral awards "not considered as domestic awards in the State where their recognition and enforcement are sought."  New York Convention, art. I(1).  This provision allows signatories to bring arbitrations conducted *at home* within the Convention's rules by designating them as "nondomestic" by their own law.  *See id.*; Restatement § 1.1 cmt. *j*; *see also infra* note 13.  Precisely what is required to be designated "nondomestic" is up to the home country.  *See Bergesen*, 710 F.2d at 932 (giving as an example of a "nondomestic" arbitration one "pronounced in accordance with foreign law").

[8] Reading § 202 independently is strange given that the United States took a reservation when it signed the New York Convention, only agreeing to apply the Convention in cases where the award was made in a country that had signed it.  Restatement § 1.4(b)(4) & cmt. c; *id.* § 4.5 rep. note a.  Yet nothing in the FAA effectuates this reservation, and the text of § 202, which does not restrict its sweep to signatory nations, (Continued)

10

The scope of Chapter 3 is nearly identical to the scope of Chapter 2. The two cover almost the same set of arbitrations despite the fact that Chapter 3 is an implementing statute for an entirely different international arbitration treaty—the Inter-American Convention on International Commercial Arbitration, *adopted* Jan. 30, 1975, 104 Stat. 448, 1438 U.N.T.S. 249 (signed by the United States June 9, 1978) (commonly known as the "Panama Convention").[9] In fact, the scope of Chapter 3 is largely defined through incorporation by reference to Chapter 2: "Section[] 202 . . . shall apply to this chapter as if specifically set forth herein." § 302. So the same nested three-part structure governs the scope of Chapter 3—with one major difference. Chapter 3, unlike Chapter 2, contains a "reciprocity" limitation, covering arbitral awards "made in the territory of a foreign State . . . *only if* that State has ratified or acceded to the [Panama] Convention." § 304 (emphasis added).

The scope of these three chapters heavily overlap. This raises the problem that some arbitrations may be governed by inconsistent rules, as the three chapters contain rules that conflict with one another. *Compare* § 9 (parties seeking a court order confirming an arbitral award must apply "within one year after the award is made"), *with* § 207 (parties

---

seemingly leaves no room for it. *But see Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 335 (5th Cir. 1987) (reading Chapter 2 to implicitly effectuate the reservation). The absence of an express statutory reciprocity limitation is particularly jarring given the inclusion of a reciprocity limitation in Chapter 3, discussed below. In any case, this strangeness does not affect this case. The arbitration at issue here was conducted in Bermuda, which has signed the New York Convention. *See* U.S. Dep't of State, *Bermuda Investment Climate Statement* 11–12 (2015).

[9] The scope of the Panama Convention sweeps more broadly than the New York Convention. It covers any "agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction." Panama Convention, art. 1.

11

can apply for a court order "[w]ithin three years after an arbitral award"). Fortunately, the FAA provides three instructions for figuring out which rules apply to an arbitration. First, the rules in Chapter 1 serve as the default for all arbitrations. When one of the other chapters is silent on a matter, the rules in Chapter 1 are incorporated by reference and serve as gap fillers. §§ 208, 307. Second, the rules in Chapter 1 always "lose" in the event of a conflict with one of the other chapters. That is, when an arbitration falls within the scope of both Chapter 1 and Chapter 2, or within Chapter 1 and Chapter 3, the rules in the latter control where they conflict. *Id.*; *see also GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 439–40 (2020). Third, the rules of Chapter 2 and Chapter 3 are mutually exclusive. When an arbitration falls within the scope of both Chapter 2 and Chapter 3, which Chapter's rules apply depends on who the parties to the arbitration are. Only Chapter 3 will apply when "a majority of the parties to the arbitration agreement are citizens of a State or States that have ratified or acceded to the [Panama Convention] and are member States of the Organization of American States."[10] § 305(1). Otherwise, only Chapter 2 will apply. § 305(2).

### B.    The Chapter Choice Matters—But We Lack The Facts To Choose

Why lay out the scope of each chapter and the conflict instructions in such detail? Because this case may come out differently depending on which rules from which Chapters apply. Appellants have requested that we refuse to recognize and enforce the arbitral award

---

[10] The Organization of American States is an organization founded to promote cooperation in the Americas.

12

on account of arbitrator Duncan's bias. But the legal impact of the arbitrator's alleged bias may not be the same under the rules from each chapter.

Chapters 1, 2, and 3 include different defenses against enforcement.[11] Chapter 1 contains an express list of four specific defenses that permit the court to vacate an arbitral award, one of which is "where there was evident partiality or corruption in the arbitrators." § 10. In contrast, Chapters 2 and 3 draw their defenses from the treaties they implement and state that a court "shall confirm the award unless it finds one of the grounds for refusal . . . specified in the said Convention." §§ 207, 302. The two treaties, which contain substantively identical lists of situations where a court may refuse to recognize and enforce an arbitral award, do not include an "evident partiality" defense. *See* New York Convention art. V; Panama Convention art. 5. In fact, they do not contain defenses that talk about bias at all. They instead contain more general defenses that permit a court to decline to enforce an arbitral award when, for example, "the arbitral procedure . . . was not in accordance with the law of the country where the arbitration took place," or when "[t]he recognition or enforcement of the award would be contrary to the public policy" of the enforcing country. New York Convention art. V(1)(d), (2)(b); Panama Convention art. 5(1)(d), (2)(b) (same).

---

[11] We have used the term "defenses" in this opinion to refer both to claims that permit *vacatur* of the arbitral award under Chapter 1 and to claims that permit *nonenforcement* of the arbitral award under the two conventions through Chapters 2 and 3. Though these two are distinct and result in different remedies—nonenforcement leaves the arbitral award undisturbed and merely declines to involve that jurisdiction's courts—for our purposes here they are the same: both mean that we will not enforce the award against the Appellants if they prevail.

13

This mismatch between the defenses available in Chapter 1 and those in Chapters 2 and 3 would not matter if a party could avail themselves of both when its arbitration fell within the scope of multiple chapters. But by their terms, Chapters 2 and 3 mandate that courts "shall" recognize arbitral awards within their scope "unless" one of the grounds in their respective treaties applies. §§ 207, 302. That mandate would appear to conflict with the availability of the four defenses listed in § 10 of Chapter 1. So, at least for arbitral awards rendered in a foreign state,[12] the conflict instructions tell us that the Chapter 1 defenses are supplanted by the relevant treaty's defenses for arbitrations that are covered by both Chapter 1 and either Chapter 2 or 3. §§ 208, 307.

This means that if the arbitration at issue is within the scope of Chapter 1 alone, Appellees would need to bring their enforcement action under Chapter 1, and Appellants could channel their arbitrator-bias objection through the "evident partiality" defense in § 10(a)(2). But if the arbitration at issue is within the scope of Chapter 2 or 3, they cannot do so because that defense is supplanted. Instead, Appellants must lodge their objection through one of the more general defenses listed in the treaties. §§ 207, 302. Appellants

---

[12] There is a potential edge case where the chapters are not in conflict and both sets of defenses may apply. Our sister circuits to have addressed the issue have concluded that parties to arbitrations conducted within the United States that are also governed by the New York Convention can use both Chapter 1 and Chapter 2 defenses. *See, e.g.*, *Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 886–87 (11th Cir. 2023) (en banc) (citing *Outokumpu Stainless USA, LLC*, 590 U.S. at 439–40) ("[B]ecause Article V of the Convention is 'simply silent' on the grounds for vacatur, there is no conflict if Chapter 1 is applied."); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997). We have not taken a position on the matter. Because this arbitration was conducted in Bermuda and does not raise this possibility, we continue to reserve that question for another case.

14

tried that here by arguing that because Duncan was biased, enforcing the arbitral award would run "contrary to the public policy" of the United States. New York Convention art. V(2)(b). So the threshold question is: into which chapter(s) does this arbitration fall? [13]

We can easily see that this arbitration falls within the scope of Chapter 1. The arbitration agreement between the parties is undisputedly a "written provision in . . . a contract evidencing a transaction involving commerce" that agrees "to settle by arbitration a controversy thereafter arising out of such contract or transaction." § 2.

We can just as easily see that this arbitration falls outside the scope of Chapter 3. Bermuda, where the arbitration between the parties occurred, has not "ratified or acceded to the [Panama Convention]"; as such, this arbitration cannot be "recognized and enforced under" Chapter 3. § 304.

That leaves Chapter 2, and it is here that we are stymied by the sparsity of the record. Recall the nested three-part structure of § 202, composed of a baseline scope, a carveout to that scope, and an exception to that carveout. This arbitration falls within the baseline

---

[13] Other questions lie downstream. For example, can we read a bias defense into Article V? Some of our sister circuits suggest as much via the public-policy defense. *See, e.g.*, *Grupo Unidos por el Canal, S.A. v. Autoridad del Canal de Panama*, 78 F.4th 1252, 1265 (11th Cir. 2023) (citing New York Convention art. V(2)(b)). But the public-policy bar is a high one. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987). And we also have a public policy in favor of enforcing arbitrations. *See, e.g.*, *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). On the other hand, § 10 of the FAA expresses a policy favoring impartial arbitrations, *Commonwealth Coatings Corp. v. Continental Cas.*, 393 U.S. 145, 147 (1968), and our Constitution expresses a deep-seated policy against biased adjudication, *see Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009). And if a bias defense exists, does the nature of arbitrations, or does comity to foreign nations, suggest a more forgiving standard? *Cf. Peoples Sec. Life Ins. v. Monumental Life Ins.*, 991 F.2d 141, 146 (4th Cir. 1993). As these questions exist only if Chapter 2 applies, we leave them for another day.

15

scope of Chapter 2 because it falls within the scope of Chapter 1.  § 202.  But on the state of the record, we cannot determine whether the arbitration falls within the carveout, the exception to the carveout, or neither.  So, depending on the facts, this case may or may not fall within the scope of Chapter 2.

First, the carveout.  Chapter 2 does *not* apply to arbitration agreements that "aris[e] out of . . . a relationship which is entirely between citizens of the United States."  *Id.*  All but one party to the insurance contracts at issue in this case are unambiguously citizens of the United States.  But we cannot discern from the record whether the last party, Capital Security, is one too.  For the purposes of § 202, a "corporation" is defined to be "a citizen of the United States if it is incorporated *or* has its principal place of business in the United States."  (emphasis added).  Capital Security is a limited company created under Bermudian law, so it is not incorporated in the United States.  It can therefore only be a citizen of the United States through the second avenue of § 202 corporate citizenship:  if it is both (1) a "corporation" and (2) has "its principal place of business in the United States."

On the "corporation" requirement, Capital Security represented at oral argument before us that it is a "corporation" for purposes of § 202.  *See* Oral Arg. at 1:34:45.  This seems at least plausible.  We know that § 202 contemplates corporations formed under the laws of foreign states; if that were not true, then all corporations would need to be incorporated in the United States to be citizens of the United States, which would make the

16

"principal place of business" avenue to citizenship wholly superfluous.[14]   But whether

Bermudian limited companies specifically fall under § 202 is a question we leave open for

the district court on remand.  *Cf. Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211,

222–26 (4th Cir. 2019) (recognizing the "longstanding difficulty" in determining the

citizenship of foreign business organizations in the context of diversity jurisdiction).

On the "principal place of business" requirement, Capital Security's representations

have been inconsistent.  It initially told the district court that its principal place of business

was in Florida.  J.A. 37.  But it later represented that its principal place of business was in

Bermuda and acknowledged the discrepancy in its filings.  *See* ECF No. 272; *see also* Oral

Arg. at 1:36:00 (acknowledging this discrepancy).  Both cannot be true.  We leave it to the

district court to determine which answer—if either—is correct.[15]  *See Sligh v. Doe*, 596

F.2d 1169, 1171 (4th Cir. 1979) ("Citizenship . . . presents a preliminary question of fact

to be determined by the trial court.").

Even if the carveout applies, there is still the exception to the carveout.  An

arbitration arising out a relationship that is entirely between citizens of the United States

still falls within the scope of Chapter 2 if the relationship:  "[1] involves property located

---

[14] We also note that this understanding of the word "corporation" is consistent with the ordinary meaning of "corporation" before and at the time of Chapter 2's passage, which encompassed any entity given legal personhood by a state.  *See, e.g.*, *Corporation*, *Black's Law Dictionary* (1st ed. 1891); *Corporation*, *Black's Law Dictionary* (3d ed. 1933); *Corporation*, *Black's Law Dictionary* (4th ed. rev. 1968).

[15] Our inability to determine the citizenry of Capital Securities for the purposes of 9 U.S.C. § 202 does not affect the district court's diversity jurisdiction under 28 U.S.C. § 1332.  Under § 1332, Appellants are all citizens of West Virginia, and there is sufficient clarity in the record to at least determine that Capital Security is not.

17

abroad, [2] envisages performance or enforcement abroad, or [3] has some other reasonable relation with one or more foreign states." § 202. And just as the record does not reveal Capital Security's citizenship, it also does not reveal the precise contours of the parties' relationship. So we again leave it to the district court to consider on remand, if necessary, whether any of these three categories obtains.[16]

*          *          *

The outcome of this case turns on complex and fact-intensive questions that went unaddressed by the district court. Because "we are a court of review, not first view," we

---

[16] Courts and commentators divide on the scope of the three exception categories. In particular, there is disagreement over what sorts of foreign connections are sufficient to place a legal relationship into one of the latter two categories. *Compare Jones v. Sea Tow Servs. Freeport NY Inc.*, 30 F.3d 360, 366 (2d Cir. 1994), *and Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1018 (6th Cir. 2003), *with* Alan Scott Rau, *The New York Convention in American Courts*, 7 Am. Rev. Int'l Arb. 213, 242–48 (1996), *and* Restatement § 1.4 rep. note b. At this stage, we take no position. But we note that the disagreement stems, at least in part, from a unique feature of how we construe implementing statutes.

Because implementing statutes are still statutes, courts must start where they do with any other statute—the text. *See Bond v. United States*, 572 U.S. 844, 856–58 (2014) (applying ordinary textual principles to an implementing statute). And in construing statutory text, courts should apply interpretive principles and canons as they ordinarily would to arrive at the best possible reading. *See, e.g.*, *Valladares v. Ray*, 130 F.4th 74, 80–82 (4th Cir. 2025). But unlike other statutes, implementing statutes are tied to a treaty. And treaties impose obligations on the United States. *See Medellín*, 552 U.S. at 504. Accordingly, "we must construe the statute consistent with our obligations under international law" to the extent possible. *Kofa v. U.S. I.N.S.*, 60 F.3d 1084, 1090 (4th Cir. 1995) (en banc) (citing *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)); *see also* Curtis A. Bradley, *The* Charming Betsy *Canon and Separation of Powers: Rethinking the Interpretive Role of International Law*, 86 Geo. L.J. 479 (1998).

How far a court should stretch the plain text of an implementing statute to accommodate treaty obligations is unclear. But it appears the New York Convention applies to *all* arbitrations conducted in the territory of other signatories. New York Convention art. I(1). So to the extent it is possible, § 202 must be interpreted as consistent with this obligation.

decline to address them in the first instance on appeal. *United States v. Avila*, 134 F.4th 244, 248 (4th Cir. 2025) (quotation omitted). The judgment is

*VACATED AND REMANDED.*